12 N.J. Super. 425 (1950)
79 A.2d 742
MARIE AMEND, PETITIONER-APPELLEE,
v.
GEORGE P. AMEND, TRADING AS AMEND ROOFING CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Essex County Court Law Division.
Decided May 24, 1950.
*427 Mr. John A. Laird, attorney for petitioner-appellee.
Mr. Andrew Lawrie, attorney for respondent-appellant.
*428 FRANCIS, J.C.C.
Plaintiff here sought compensation from defendant-employer under the provisions of the Workmen's Compensation Act on account of the death of her husband. The Workmen's Compensation Division of the Department of Labor and Industry awarded death benefits to her of $6,000 plus the statutory funeral allowance and counsel fees. The employer now appeals from this award.
The petition for compensation alleges that on December 1, 1944, the decedent, Frank T. Amend suffered compensable heart damage while in defendant's employ as the result of which he died on May 29, 1945. The only statement appearing in defendant's answer is, "Respondent joins issue in the allegation of the petition as to any causal relationship between claimant's death and any accident."
At the hearing plaintiff produced, under subpoena, the defendant, George Amend, who is the brother of the decedent. He testified that decedent had worked for him for about 25 years. On December 1, 1944, his brother came to him and told him that he "went over to the warehouse to start the truck,  the starter wasn't working that morning. He cranked it and the thing backed up and the crank hit him in the chest." The injured man then "sat around a while" and said "I don't think I had better go out today." Then the defendant took him home where he remained for two or three weeks. He returned and worked about one day and never came back again.
Defendant notified his insurance carrier, Coal Operators Casualty Company, of the accident. He gave it a report, and to his knowledge the company conducted an investigation of the occurrence.
According to decedent's widow, defendant brought her husband home about noon on December 1, 1944. At this time he appeared sickly and "scary" and she put him to bed. Thereafter her husband received compensation payments of $380 for 19 weeks at $20 a week.
Plaintiff produced and marked in evidence Forms 1, 2 and 3 which were filed by the defendant insurance carrier with the Department of Labor.
*429 Form 1 which was prepared on February 7, 1945, recited that the injured employee, Frank L. Amend, while "cranking motor of truck felt pain around heart"; that the "nature and extent of injury" was "heart strain" with recovery probable in "10 weeks." Paragraph 11 of the form also says: "If no compensation was or is to be paid the injured, state that fact below, and give reasons on reverse side." In the blank below this appears: "Compensation being paid."
Form 2 which was prepared on the same day and which was signed by decedent and the carrier, recited that medical aid was required, that the carrier would pay for such aid as required by law, that the probable date of recovery was 10 weeks and that the compensation rate was $20. Immediately above the carrier's signature appears the following statement:
"The undersigned affirms the correctness of the statements given and guarantees the paying of compensation as stated therein according to law, for temporary disability and for permanent injury, if any."
Form 3 which was prepared by the carrier on July 17, 1945, over six weeks after Amend's death, sets forth that temporary disability compensation was paid to him for 19 weeks at $20 weekly; that "claimant died," and that the injury resulted in death. Again over the carrier's signature appears the same notation as in Form 2, namely, that the correctness of statements is affirmed and that the carrier guarantees the payment of compensation according to law.
The record does not show when the payments of compensation began or when they ended with respect to the date of death. There were 24 weeks between the accident and May 29, 1945. Form 3 says the disability began December 24, 1944. If this date marked the inception of the payments there would be 20 weeks and 5 days between it and the date of death.
Plaintiff undertook to provide accurate proof on this subject by serving a subpoena duces tecum upon the carrier to require the production of all of its records in the case and *430 specifically requiring the production of a statement signed by Amend in his lifetime and the checks for the payments of the 19 weeks' compensation. Plaintiff's counsel asserted the subpoena was directed to T. Zimmer who signed Forms 1, 2 and 3 and that service was made upon one F. Williams, manager of the carrier's office in Newark. Apparently the carrier received the subpoena but defense counsel said that it had no T. Zimmer and that the person named was not served. In any event, the requested statement and checks were not produced.
The death certificate received in evidence gives anterior coronary occlusion as the cause of death.
No medical testimony was offered by the plaintiff to establish the existence of causal relation between any employment, unusual effort or strain and the fatal occlusion.
The record of the City Hospital discloses that Amend was admitted on April 9, 1945, suffering from a coronary occlusion. He was discharged as improved on May 5, 1945.
The first page of the record recites that the patient was unable to give information on his admission; the second page sets forth among other things that the patient claimed good health "until present cardiac condition" and the history sheet recites that the information contained therein came from "family."
At the opening of one of the hearings plaintiff made application on notice to join the carrier as a party defendant under R.S. 34:15-84. Decision was reserved but the motion was never decided.
In defense defendant produced two medical witnesses:
Doctor Herman Busch examined Amend on May 20, 1945. On this occasion he said a history was obtained to the effect that while cranking a car in the beginning of December, 1944, he suddenly experienced a sharp pain in his chest which lasted for about a half-hour. He continued to work for about three weeks when he collapsed. He sent for his doctor who made a diagnosis of coronary occlusion. He remained at home for a few weeks not completely confined to bed and again experienced *431 a similar attack with unconsciousness. Then he was confined to the City Hospital for about six weeks but on this date he was at home. In the doctor's opinion he was totally disabled with the prognosis poor, and suffering from marked myocardial degeneration due to "the diffused vascular and coronary sclerosis of long standing."
It was Doctor Busch's opinion on the basis of this history and the hospital records that there was no causal relation between the car cranking incident and the death. The doctor said that Amend did not have a coronary occlusion prior to December 1, 1944, but he did have coronary insufficiency of a great many years standing. Amend denied to him that he ever had angina or any prior coronary attacks. And the doctor said he did not know of any coronary attacks prior to December 1, 1944. He took "it from the amount of involvement that he didn't have it." The doctor conceded that effort will produce a coronary occlusion in a person who has a marked coronary sclerosis.
Defendant also produced Doctor Asher Yaguda who had never examined the decedent. A hypothetical question was propounded to him in which he was asked to assume that on December 1, 1944, while Amend was cranking
"the motor of a truck the thing backed up and the crank hit him in the chest. He experienced a sharp pain in the chest which lasted one-half hour. He continued working for about three weeks, when he was forced to stop working. He was then treated by his own doctor several times and on April 9, 1945, he got out of bed and collapsed in his room. He then became cyanotic and had marked dyspnea and perspired. At that time he was given a quarter-grain of morphine, and then taken by ambulance to the Newark City Hospital, where he was admitted on, April 9, 1945, at 1:20 A.M.
"On admission to the Newark City Hospital his temperature was 98 degrees, pulse 120 and respiratory rate 36. The white blood count was 52,200. At the City Hospital he gave a history of having a known high blood *432 pressure with anginal attacks for a long time, for which he had been taking nitroglycerine. For the past few weeks before his admission to the Newark City Hospital, according to the history, he had attacks of severe anterior chest pains relieved by rest and nitroglycerine. On admission to the Newark City Hospital there was cyanosis of the lips, there was dyspnea, the blood pressure was 164 over 115. An electrocardiogram was taken on April 9, 1945, which showed evidence of recent anterior coronary occlusion. On April 11, 1945, he was given digitalis and on April 13, 1945, he developed a paralysis of the entire right side of the body and incontinence of the bladder. After this he improved somewhat and was discharged on May 5, 1945.
"After leaving the hospital he was examined by Doctor Busch on May 20, 1945, and he found an obese man weighing 200 pounds, dyspneic, rales in his lungs, and a suggestion of fluid in the right pleural cavity. There was evidence of arteriosclerotic changes in the eye grounds, in the lower extremities, and in the blood pressure. The heart was apparently decompensated, as indicated by the marked peripheral edema and the swollen tender liver. At the time he was seen by Doctor Busch he still had evidence of a partial right-sided paralysis and an involvement of his speech.
"Subsequent to this examination, he died on May 29, 1945, and the death certificate which is in evidence states the cause of death as coronary occlusion."
On the basis of these facts he was asked: "Doctor, in your opinion, was there any causal relation between the incident described on December 1, 1944, and this man's death on May 29, 1945?"
After the question had been amended by striking out the assertion that the decedent gave the hospital history and substituting therefor the statement that the history given was as recited, the doctor said there was no causal connection. Later in his examination he expressed his basic medical opinion *433 that he does not believe "that coronary occlusion is the result of effort."
After a consideration of the facts the deputy director found that the decedent not only suffered "an unusual strain in the cranking of a truck motor on a cold day but in the striking of his chest by the kick-back of the crank handle" and that the heart attack consisting of a coronary occlusion arose out of this incident. He further found that the death resulted from his heart attack and accordingly compensation was awarded.
At the outset of a consideration of defendant's appeal it must be recognized that no part of defendant's testimony as to what the decedent told him about the happening on December 1, 1944, is considerable in support of the award. It is not suggested that decedent's version of the incident was part of the res gestae. In fact, the evidence is to the contrary. Such proof was competent and admissible to prove compliance by the employee with the requirements of the Workmen's Compensation Act for the giving of notice of an accident to the employer. R.S. 34:15-17. However, it has no probative force whatever toward the establishment of a compensable accident. Dobrowolski v. Glowacki, 136 N.J.L. 167 (E. & A. 1947).
The award can be sustained only by crediting the Forms 1, 2 and 3 and the payment of compensation for temporary disability with sufficient probative efficacy to make out a prima facie case and if the greater weight of the evidence on the whole record supports the conclusion that decedent suffered a compensable accident on December 1, 1944, which resulted in his death on May 29, 1945.
These forms which were filed by the carrier on behalf of the employer clearly constitute an admission that on December 1, 1944, decedent suffered a compensable heart strain while cranking a truck, which resulted in his subsequent death.
In appraising the weight to be accorded them as admissions, it must be kept in mind that the carrier was notified of the accident by the employer and conducted an investigation. *434 Defendant offered no proof as to what the investigation consisted of. When the subpoena was served seeking production of decedent's statement, no claim was made that no such statement was taken. Rather reliance was placed upon an asserted technical defect in the subpoena.
It is said to be a matter of common knowledge that on notice of an accident or claim of an accident during the course of employment, the workmen's compensation insurance carrier takes over the investigation and handling of the claim. 31 C.J.S. sec. 29e, p. 572; sec. 28, p. 543.
Whether this judicial shortcut can be taken need not be determined because the record shows that the claim, investigation thereof and the hearing below were in the hands of the carrier. While different counsel is handling the appeal, no substitution of attorney has been filed, so it must be assumed that the carrier is still moving on behalf of the employer,
Here the first form filed by the carrier was prepared over two months after the employment incident. It is inconceivable that a compensable heart strain would have been admitted therein, the statement made that compensation was being paid and compensation, in fact, paid, if the investigation did not warrant such action. It is likewise inconceivable that after payment of compensation for temporary disability another form would be filed almost two months after the death again making an admission that death resulted from the injury, if such admission were not the product of considered judgment. The fact that a monetary liability in excess of $6,000 was involved renders untenable the notion that such admissions were lightly made.
R.S. 34:15-99 which prohibits the use of the report forms "as evidence against any employer in any suit or action at law brought by an employee for the recovery of damages" is not a bar to their admissibility. The section has been construed not to apply to a workmen's compensation proceeding. Miller v. National Chair Co., 127 N.J.L. 414 (Sup. Ct. 1941); affirmed, 129 N.J.L. 98 (E. & A. 1942).
*435 There is no case in New Jersey which deals directly with the evidential value of these forms or the voluntary payment of compensation. Burns v. Edison, 92 N.J.L. 288 (Sup. Ct. 1919) throws some light on the problem. There, following a fatal accident on September 2, 1915, it was claimed that the employee's widow and the employer made an oral agreement for the payment of compensation benefits. Thereafter the employer made 78 weekly payments and then ceased doing so. The widow filed a petition for compensation, pleading the accident and oral agreement. The employer denied the accident, the agreement, and set up the Statute of Frauds as a bar. At the hearing petitioner proved the employment and the agreement and deliberately offered no proof as to the accident. The trial court declared that the employer was estopped from producing evidence to show absence of accident and made an award of compensation.
On certiorari, the Supreme Court, by Justice Parker, said:
"* * * Viewing the case as a suit for compensation under the statute based on proof of accident * * * the court clearly erred in excluding proof that no accident had occurred. This, of course went to the root of the case, and the estoppel theory is untenable. * * * The agreement testified to, so far as concerned the occurrence of an accident arising out of and in the course of employment, was evidential, but nothing more. Like any admission out of court, it could be qualified or contradicted by parol evidence."
In Dubies v. Manufacturers' Liability Ins. Co., 96 N.J.L. 107 (Sup. Ct. 1921); affirmed, 97 N.J.L. 567 (E. & A. 1922) the employee recovered a judgment representing workmen's compensation in the Court of Common Pleas. The opinion indicates that there had been an award in the Bureau on which the respondent had made some payments and then ceased. At the trial the plaintiff's offer of "three forms, filled out from the files in the office of the department of labor, as the original records in the office of that Department" was rejected because in the absence of statutory warrant copies were not receivable. Plaintiff then rested and defendant's motion to dismiss for failure to prove a contract was denied. The judgment for the plaintiff was affirmed on appeal.
*436 Apparently the strength of the plaintiff's case depended upon an admission in the defendant's answer that it had paid compensation. The court said:
"* * * The seventh paragraph of the defendant's answer admitted the paying of compensation to the defendant, pursuant to the provisions of the Workmen's Compensation Act. These payments were evidence of the making of an agreement between the parties for the payment of compensation to the plaintiff, as the presumption would be that they were made only under the provisions of the law which required the making of an agreement. This presumption remained unrebutted by any evidence offered by the defendant to the contrary."
The New York courts have had a similar problem for consideration. Craciola v. Lewis, 253 N.Y.S. 752 (App. Div. 1931), involved an appeal from an award of compensation for facial disfigurement suffered by a six-year-old child. At the time of the accident the child's mother and other women were engaged in picking peas for the defendant. In this occupation the length of the season required that female pickers bring their young children along with them. The children played in the fields, sometimes helped their mothers pick the peas and otherwise amused themselves. They were never employed and never paid wages. The petitioner had gone to sleep under a pile of pea vines and was run over by a truck being used to gather baskets. The employer made a report of the accident to the Industrial Commission, in which it identified itself as an employer and stated that it was in the pea business. It made the answer "Pea picker" to a question as to the injured person's regular employment, and answered "Yes" to a question as to whether he was injured in his regular occupation. And it described the happening of the injury by saying that he was run over by a car on a pea field.
On appeal the award was reversed because of undisputed evidence of absence of employment of the child. However, in the discussion of the admissions made in the accident report, the court declared:
"Whether made by the employer or by his authorized agent, the employer is bound by the admission made in the report, whether the *437 party making it had personal knowledge or merely information as to the facts admitted. The * * * admissions are competent common-law evidence, * * * they may be sufficient in themselves to justify a finding of liability."
Again in the matter of Lanni v. Amsterdam Building Co., 216 N.Y.S. 763, 217 App. Div. 278 (Sup. Ct. 1926), where a night watchman was murdered on his employer's premises, the defense was that the fatality did not arise out of and in the course of the employment. However, in affirming an award the court looked to the employer's report of the injury to establish by admission the fact that decedent was injured while engaged in his regular occupation.
Petitioner prevailed before the Industrial Commission and the Court of Appeals sustained the award for death benefits in Anthus v. Rail Joint Co., 185 N.Y.S. 314 (App. Div. 1920); affirmed, 231 N.Y. 557, 132 N.E. 887 (Ct. of App. 1921). There it was alleged that the employee's death was caused by blood poisoning following a traumatic injury to his right foot. The evidence in support thereof was a statement made in the employer's first report of the injury. The report stated that while unloading billets one of them scratched his foot and the doctor found blood poisoning had developed. The report was signed in the name of W.J. Bradley, superintendent of the defendant, but the proof showed that this subscription was made by a clerk employed by the company, one of whose duties was that of making accident reports for the company.
In sustaining the award the court said:
"* * * The statement which Miss Brody gave must * * * be regarded as an admission of a fact of liability, made by the employer itself, through an authorized agent. It cannot matter that the bases of her statement were the declarations of the deceased. Since an admission of a party made out of court is in itself hearsay, receivable * * * under a definitely recognized exception to the hearsay rule, its competency or relevancy cannot be affected by the question whether the party making it had personal knowledge or merely information as to the fact admitted. * * * In this case, therefore, we have common-law evidence of the occurrence of an accident in the course of an employment, which arose therefrom, and are not *438 compelled to rely solely upon the statements of the deceased person himself as to the cause of his injury."
O'Boyle v. Harry Seitz & Sons, and Alliance Casualty Co., 160 A. 145 (Super. Ct. Pa. 1932), presents a somewhat analogous situation. There a compensation claim was filed by a dependent widow. Death was caused by a fall while decedent was stringing an aerial. Defendant's answer denied that decedent was in the course of his employment at the time of the accident and averred that he was working on his own at the time. Petitioner's proof consisted of two types of evidence:
1. Hearsay, made up of declarations by a fellow employee that he and decedent had been directed by their employer to hang the aerial.
2. Declarations made by one of the defendant partners, who is alleged to have told petitioner that "she need not worry," that "`everything would be all right and that compensation would take care of me and him no matter how long he was in the hospital.'" Petitioner's mother also testified to overhearing one of the partners declare in a 'phone conversation that "one of his men was hurt while at work"; she also testified that she heard him declare to a newspaper man that the decedent was in the course of his work when he fell.
The defendant argued that only hearsay proof supported the petitioner's claim that decedent was in the course of employment at the time of the accident. The court held that the declarations testified to were admissions and that they warranted a finding that decedent was in the course of his employment at the time he was hurt.
The rule deducible from these cases for application to the present controversy is a just and reasonable one. It is that the Forms 1, 2 and 3, the admissions contained therein and the payment of compensation constitute a prima facie case for the petitioner.
However, it is claimed that the employer is the defendant here and that an admission made by his insurance carrier is neither binding on him nor admissible against him. This is rather an unusual and anomalous argument to present since *439 the record discloses that the carrier was notified of the accident, investigated the matter and is defending the claim now on behalf of the employer.
The forms referred to are part of the required routine handling of workmen's compensation claims. They are filed in the name of the employer and where it appears that the carrier is handling the matter on behalf of the employer by reason of the insurance coverage, there is identity of interest between them so far as the particular claim is concerned.
All employers are required to carry workmen's compensation insurance, except those who are exempted on proof of a certain financial capacity. R.S. 34:15-70 et seq. The contract of insurance is for the benefit of the employees and their dependents and may be enforced by them as if they were parties thereto. R.S. 34:15-83. The carrier may be joined in the petition for compensation (R.S. 34:15-84) and an effective award of compensation may be obtained in the Workmen's Compensation Division against the carrier. Miller v. National Chair Co., 19 N.J. Misc. 275 (Wkmn. Comp. Bur. 1941); affirmed, 127 N.J.L. 414 (Sup. Ct. 1941).
Knowledge of or notice to an employer of an employee's injury is imputable to the carrier and the carrier is bound by orders and awards against the employer. R.S. 34:15-85. And the policy coverage must be that of the employer's workmen's compensation liability. R.S. 34:15-87. Furthermore, the carrier can by agreement duly signed "settle upon and determine the compensation due to the injured employee." R.S. 34:15-50.
Further, under this compulsory insurance act the employer is required to notify his carrier in accordance with the terms of the policy upon the happening of any accident. R.S. 34:15-96. The carrier, immediately on receiving knowledge of an accident to an employee causing disability beyond the waiting period, must report to the Workmen's Compensation Division on a form prescribed by it. Then, within three weeks after such knowledge is received, it must send a second report containing a statement of wages and an agreement to *440 care for the case according to the terms of the compensation law. This report is to be signed by the employee as provided thereon and by the employer or insurance carrier. R.S. 34:15-98. If such an agreement is not filed within 21 days after the injury the Workmen's Compensation Division "shall, so far as practicable, endeavor to bring about a settlement of the pending claim." R.S. 34:15-50. And it is a matter of common knowledge that when such an agreement is not filed the Division itself on notice to the parties sets the matter down for informal hearing.
The legislative scheme created by this compulsory insurance act makes it plain that when the carrier files these Forms 1, 2 and 3, so far as the employee or his dependents are concerned, it does so on behalf of the employer and on its own behalf and that there is presumptively, at least, identity of interest between them.
As already set forth, petitioner moved to add the carrier as a party to this action but the motion was not decided. It would have simplified the consideration of the effect of these forms if the motion had been acted upon affirmatively. Of course, the cause could be remanded for this purpose. However, in view of the determination made herein of the relation of the employer and the carrier, such a remand does not seem essential.
Accepting the plaintiff's proof as establishing a prima facie case, the problem remains as to whether on the whole case she has sustained the burden of establishing by the preponderance of the evidence that the decedent suffered a compensable accident and died as the result of it. This ultimate determination requires a consideration of the evidence offered by the defendant.
As already indicated, defendant's proof consisted of the testimony of two medical witnesses. Both of them asserted that the car cranking incident of December 1, 1944, was not the producing cause of the decedent's death. Analysis of their testimony and particularly the hypothetical questions put to them reveals some critical weaknesses. Doctor Asher Yaguda's *441 opinion loses most of any possible probative force at the very outset of the consideration of his testimony because he expounded a basic medical theory which has been rejected many times by our courts. Specifically, the doctor said he does not believe "that coronary occlusion is the result of effort."
This view was the subject of comment by the Supreme Court in Breheny v. County of Essex, 132 N.J.L. 584 (Sup. Ct. 1945); affirmed, 134 N.J.L. 129 (E. & A. 1945). There the court, speaking of the defendant's medical experts, said:
"Their conclusions were concededly based on the premise that `effort and trauma are not causally related to coronary occlusion,' * * *. That premise sounds a familiar but discordant tone; it ignores the construction which we have given to the meaning of a compensable accident under our act, i.e., one which arises out of and in the course of a workman's employment."
Furthermore, it will be noticed that certain parts of the hypothetical question put to Doctor Yaguda have been italicized. This was done in order to point out matters which were resolved adversely to the defendant's claim by the deputy director or which are not in the record or which are not evidential against the plaintiff.
For example, the doctor was asked to assume that Amend continued to work for about three weeks after the incident of December 1, 1944. While the statement appears substantially in the history Doctor Busch said he obtained from the decedent, it is contrary to the testimony of the plaintiff and the defendant, George Amend. These latter two witnesses were described by the deputy director as truthful and he found the fact to be as testified by them, i.e., that the decedent did not report for work for two or three weeks after December 1, 1944.
Again, he was asked to assume that Amend had "a known high blood pressure with anginal attacks for a long time, for which he had been taking nitroglycerine." This statement comes from the history appearing in the City Hospital record and it is obviously hearsay. Nowhere is it even suggested that *442 the history was given by the decedent. On the contrary, the only statement from him on the subject of his heart condition appearing in the record is to the effect that he had been in good health "until present cardiac condition." Moreover the record is barren of any other evidence of probative value that he took nitroglycerine before December 1, 1944. Doctor Busch said that as far as he knew the taking of this drug could have begun subsequent to that date.
These grave and material defects in the hypothesis assumed by the doctor obviously impair the weight of his opinion. And when to this is added his basic medical theory of absence of causal relation between effort and a coronary occlusion, which it must be inferred would have produced a negative answer no matter what the hypothesis, his conclusion is emptied of probative force.
Doctor Busch is the only medical witness who saw Amend before his death. His examination was made on May 20, 1945, and the record indicates that he wrote a report to defendant's counsel. On the basis of the history obtained, which he said included a statement by Amend that he worked for about three weeks after the car cranking incident, and his findings, he concluded that the effort did not cause the occlusion or death.
Manifestly, the history of continued work for about three weeks was to the doctor, and is to the determination of this cause, an important consideration. Two lay witnesses, found to be credible, with first hand information on the subject, swore the fact to be that he was out of work for two or three weeks, returned for part of one day and collapsed. It seems probable in view of this conflict that in Doctor Busch's conference with Amend there was some mention of a three-week period. It seems likely that the doctor was mistaken or misunderstood Amend's reference to three weeks. It must be kept in mind that at this time, just nine days before his death, he was confined to bed complaining of shortness of breath, sharp pain and inability to be in the recumbent posture. He breathed "jerkedly and rapidly as though he is in distress." *443 "His chest `showed poor expansion' and many rales." The heart sounds were "weak and distant with occasional missing beats and galloping rhythm." He was "partially paralyzed on the right side with the speech center somewhat involved due to cerebral thrombosis." Under these circumstances the finding of the deputy director that the affirmations of the two lay witnesses that he was out of work for two or three weeks after the date referred to are entitled to greater weight, is a reasonable and proper one.
According to Doctor Busch, Amend had coronary sclerosis and coronary insufficiency of many years standing, and Doctor Yaguda said he was "a candidate for a coronary occlusion." However, he had no coronary occlusion and no coronary attacks prior to December 1, 1944. And the doctor conceded, contrary to Doctor Yaguda, that effort, exertion and strain can produce an occlusion in a person with a marked coronary sclerosis. This medical belief makes it reasonable to conclude that if, instead of a history of continued work for three weeks after cranking the car, he had a history of no work for that period, his opinion as to causal relation would be different.
As already indicated, Doctor Busch sent a report to defendant's representative. Yet, just three days short of two months after his examination and six weeks after Amend's death, defendant admitted by his insurance carrier in Form 3 that the death resulted from the injury. Defendant offered no explanation of the admission. So, it must be assumed that it was made wilfully, deliberately and with a consciousness of its significance.
On the whole record the evidentiary force given to the plaintiff's case by the forms filed, the admissions contained therein and the payment of compensation, is such that the presumption that the death from heart disease was the "result of natural physiological causes" (Seiken v. Todd Dry Dock. Inc., 2 N.J. 469 (1949), and cases cited) has been overcome and that it was the result of a compensable accident has been established "by the preponderance of the probabilities."
Therefore the deputy director acted with legal propriety in awarding compensation to the plaintiff.