56 N.J. Super. 93 (1959)
151 A.2d 568
DOROTHY LOEW, PETITIONER-APPELLANT,
v.
BOROUGH OF UNION BEACH, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 23, 1959.
Decided May 12, 1959.
*95 Before Judges PRICE, GAULKIN and CONFORD.
Mr. Kenneth E. Joel argued the cause for petitioner-appellant (Messrs. Heuser, Heuser & De Maio, Mr. Ralph S. Heuser, of counsel).
Mr. Isidor Kalisch argued the cause for respondent-respondent (Mr. Stanley U. Phares, attorney).
The opinion of the court was delivered by PRICE, S.J.A.D.
By this appeal in a workmen's compensation case, petitioner Dorothy Loew, widow of decedent Harold Loew, challenges the judgment of the County Court affirming the determination of the Department of Labor, *96 Division of Workmen's Compensation, dismissing her dependency claim petition.
Pursuant to Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958), and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 448 (1958), we have analyzed the evidence in the case at bar "to determine the facts and evaluate them." In doing so we have given "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses."
Decedent, 46 years of age, suffered a heart attack on June 11, 1957, from which he died on June 24, 1957. The basic question before the Division and the County Court and presented by this appeal is whether or not the fatal attack was work-connected.
Decedent had been employed as a laborer by respondent for over five years next preceding June 11, 1957. He worked eight hours a day, five and one-half days a week. His general duties were reading and installing water meters, repairing leaks in water-service lines which required him to make street excavations; cleaning street gutters; annually, with other municipal employees, transporting calcium chloride from the railroad station and storing it in the municipal garage and thereafter with others spreading the chloride on borough streets.
Meter reading was done quarter-annually and occupied about one month of decedent's time each quarter. The meters which he installed had a maximum weight of 35 pounds per meter. The repair of the water service lines required the use of a pick and shovel by decedent. He had to use the pick to penetrate the hard street surfaces and then dig to a depth of three feet to reach the pipe lines. This type of work was performed by decedent several times each year. The street cleaning work was performed bi-weekly and decedent's part in it would consume from one-half day to a full day. The work involved in storing and spreading calcium chloride entailed the transportation of several hundred bags of the material from the railroad station in Keyport to the *97 municipal garage in Union Beach, a distance of one mile. In 1957 a total of 700 bags of 100 pounds each were so transported. With the aid of a handtruck the bags were removed from a railroad car to a motor truck, then transported to the garage and there unloaded and piled. This work had been done by four men of whom decedent was one, and had occupied one day. It had been completed a few days before June 11. Seven trips were required to accomplish the transfer of the shipment of chloride. The evidence justifies the conclusion reached by the Deputy Director that this was heavier and harder work than that which decedent had been doing in the forenoon of June 11 and harder than the work which he was undertaking just before he became ill on that day, as hereinafter related.
The work of spreading the chloride on the streets commenced June 11 and took three days to complete. The record reveals that in that operation the chloride is loaded on a municipal truck, and as the work of spreading the material on the streets goes forward, the bags on the truck are lifted to a hopper thereon and by a spreader the material is applied to the street surfaces. On June 11 decedent arrived at the municipal water plant at 7:30 A.M., worked there during the forenoon, had lunch between 12 noon and 12:30 P.M. and then swept the floor of the building. In the afternoon he with others was assigned the task of loading a truck with calcium chloride preparatory to spreading the material on the streets. For that purpose, about 1 P.M. he went to the municipal garage, where the chloride had been stored as aforesaid.
Certain of decedent's co-workers testified that it was a hot day; the temperature was estimated by them to be 85° to 90° , or, as described by one of the witnesses, "in the 90's" and "sticky." Co-employees of decedent estimated that it was possibly 10° warmer and was "stickier" inside than outside of the building when decedent arrived at about 1 P.M. on the day in question. However, climatological data introduced by respondent showed that on June 11, 1957 the *98 temperature readings at the two weather stations nearest to Union Beach, i.e., at Long Branch and at Sandy Hook, were a minimum of 51° and a maximum of 79° at the former, and a minimum of 56° and a maximum of 81° at the latter.
The municipal garage was made of galvanized iron. It was approximately 80 feet long, 40 to 60 feet wide (reflecting divergent estimates by witnesses), and 30 feet high. There was a large opening in front of the building where doors, formerly rotted and not repaired, had once been located. There were holes in the roof large enough to admit rain. It had one window at the front. Testimony was presented that there was no "cross ventilation." However, the County Court found that photographs of the building received in evidence showed that the effect of the passage of time and the action of the elements had "so perforated the metal roofing and sides as to permit some passage of any existing breeze or movements of air if such existed." The Deputy Director, questioning the soundness of the lay evidence that it was "hotter and stickier" inside the building than outside, emphasized the location of the large open area where the doors had formerly been placed and the existence of "plenty of open spaces throughout the building."
Decedent, with other employees of defendant, commenced the work of loading the 100-pound bags from the stacked piles to the truck. Decedent had been in the garage only about 15 minutes before he became ill. The work in the garage had not been continuous. Part of the time the workmen, including decedent, had been standing and talking. It was customary for two men to join in lifting one bag at a time to the tailboard of the truck where they were handled for placement on the truck by a third employee. Following this practice, on June 11 decedent and a co-worker had, during the aforesaid 15 minutes, lifted two bags from the pile to the truck. After lifting the second bag decedent complained of feeling ill. The co-worker, Richard Tremley, who was on the truck receiving the bags, testified that Loew *99 then said: "Dick, I don't feel good." According to the same witness decedent said that "he had pain in his stomach." In response to an inquiry from Tremley as to the nature of his illness decedent pointed to his stomach. He perspired and "looked a little white." He went outdoors and sat on a bench in response to a suggestion from one of the workmen. In a few moments he was assisted to the water-works building approximately 100 feet from the garage. He again complained of "pains in his stomach" and perspired "something awful." An ambulance was called and he was removed to a hospital at about 2:30 P.M., where he was seen in the emergency room by Dr. Herbert W. Engel, a specialist in internal medicine and hematology, who had been licensed to practice in New Jersey in 1955. Dr. Engel had been called in consultation by a Dr. George Cowling, who did not testify in the cause. Decedent at the time he was first examined by Dr. Engel was "breathing heavily, quite pale, sweating, cold and clammy." His blood pressure had "dropped" and he was "complaining of pain in the left anterior chest." A tentative diagnosis of acute myocardial infarction was made. Emergency treatment was given, i.e., oxygen, the institution of anti-coagulant therapy, sedation and analgesics. Dr. Engel continued as the attending physician until the date of death. The final diagnosis was "acute myocardial infarction due to coronary thrombosis, pulmonary embolus and congestive heart failure."
Following a recitation of the facts in hypothetical form, which included a reference to the aforesaid diagnosis made by him, Dr. Engel was asked the following question and gave the following answer as reflected in the record before us:
"Assuming those facts, would you have an opinion with reasonable medical certainty as to the causal relationship between the activity in which he was engaged in the lifting of the bags coupled with the weather; in addition, an opinion which you hold with reasonable medical certainty as to the causal relationship between his work and the weather and the diagnoses which you made? A. Well, I think there must be certainly a causal relationship because of the direct time relationship of the epigastric and substernal pain to the time *100 when the patient complained of pain, as I understand it  and, of course, I wasn't here for the other testimony  when he had lifted these two bags. * * * The man complained of pain at the time. We have on other occasions  and certainly this is documented in the literature, that there is a relation in large numbers of cases to the occurrence of strain and coronary, the occurrence, especially after eating, of coronaries. The weather may have had some factor to do with it as well."
On cross-examination the record reveals the following further testimony given by Dr. Engel bearing on the issue as to whether decedent suffered an accident which was work-connected:
"Q. Do you have an opinion as to whether or not your patient had any circulatory disability prior to June 11, 1957? A. I had never seen the patient prior to June 11th, and, therefore, one cannot say conclusively. There certainly is that possibility. However  * * *
Q. Let me ask you this, Doctor: Could he have had a coronary occlusion on June 11, 1957, without some pre-existing circulatory or pathological changes? A. Yes.

* * * * * * * *
Q. What do you think Mr. Loew had before June 11, 1957? A. I cannot say with certainty whether or not he had pre-existing coronary artery disease.
Q. Would an autopsy have shown that? A. It may and may not have.
Q. You said, as I understood you, that you thought you would have to say there was causal relationship during this fifteen minute interval when the deceased was in the shed because of the complaints of pain came in point of time at the same time? A. Yes.
Q. Is that the only thing on which you base your opinion? A. No.
Q. What other reason do you give? A. And also the history that is given of the excessive lifting of the bags at the time that  in other words 
Q. You mean the hypothetical question or some history that you got somewhere? A. In the hypothetical question that Mr. Joel gave me.
Q. Is there any other reason for your basis for your opinion? A. Regarding?
Q. Regarding causal relationship? A. No, I cannot think of any.
Q. So that because you are assuming there was excessive lifting and because you are assuming that at that time there was a complaint of pain, you feel that that is enough and that is the only basis for your opinion that there is causal relationship between the *101 coronary occlusion and what happened, or what the man was doing, in that fifteen minute interval; is that right? A. Yes, sir.

* * * * * * * *
Q. By the way, not long before this June 11, 1957 occurrence, your patient with four other men, instead of lifting two of these bags, we assume had lifted about 150 bags. A. Yes.
Q. Why didn't it happen then? A. I can't give you an answer to that question."
The record before us further reveals that Mr. Brower, the water superintendent of the municipality, described the decedent as a "pretty slow worker on account of his weight"; that he was a "little over-weight"; that the decedent "never did feel very good"; that he "would puff and blow, * * * you could tell that he had a little too much weight onto him when he was working hard * * *."
The testimony of petitioner, called as a witness on her own behalf, was limited to proof that she was decedent's wife at the time of his death. She was not interrogated by her attorney as to the condition of her husband's health prior to his fatal attack.
It is also noted by us that an extract from the record at the hospital, to which decedent was taken after his attack, sets forth under a caption "Physical Examination," dated June 11, 1957, the following: "abdomen distended * * * liver enlarged * * * constipation." The "Progress Record" under the same date reveals the following:
"Pt referred for medical care following acute attack of substernal epigastric pain Apparently pt not normal for a period of 4-5 mos c [with] precordial pain & distress today at 1 30/PM sudden precordial & epigastric pain nausea, sweating "
Dr. Jerome O. Kaufman, a doctor of internal medicine specializing in cardiology, called as a witness by respondent, testified that he had been practicing his profession since 1927. A hypothetical question, reciting the proofs in the case in substantially the same general form as set forth in the question propounded to the physician appearing on behalf *102 of petitioner, was presented to Dr. Kaufman. In response to interrogation as to whether or not there was "any causation between Mr. Loew's work on June 11th for the Boro of Union Beach, and his heart attack which occurred on June 11th at between 1:00 and 1:15 in the afternoon" he stated: "It is my opinion that there is no causal relationship. That is based upon the facts within the hypothetical question because I fail to find any stress incident which could be, in my opinion, sufficient to contribute to the onset of the coronary occlusion." He stated that the symptoms exhibited by decedent when Dr. Engel first saw decedent represented a "typical reaction to a coronary occlusion." The witness expressed the view that on the day in question decedent "developed an attack of heart disease known as a coronary occlusion, which is based on a pre-existing arteriosclerosis of the coronary arteries; and this resulted in a myocardial infarction; which means death of the tissues due to a lack of blood supply." He added: "Arteriosclerosis is a natural common condition of man to-day. This was the natural sequela of that condition." He stated that the majority "of people who develop coronary occlusion with infarction do so at rest." He expressed as his general opinion that "it is infrequent that effort plays a role in the onset of occlusion" and that "medically speaking, almost no case of coronary thrombosis is related to strain or stress." He noted, however, that a study in which he had participated had been conducted at one of the hospitals in this State in which 900 cases of coronary occlusion were reviewed of which there were 12% "in which there was any probable relationship" between the heart attack and effort.
On cross-examination he was queried with reference to the effect of lifting a 100-pound bag of calcium chloride. He answered that the "bag was lifted by two people and I fail to see how lifting 50 pounds in weight by a laborer is anything which is excessive or strain * * * there are a great number of us who aren't laborers, who can lift and *103 carry fifty pounds. * * * I don't believe that is a heavy load for a laborer."
With reference to heat and humidity and its possible relation to a heart attack he said that under "certain circumstances heat and humidity may be a factor." He testified that such reference was to "marked humidity, heat and exposure over a long period of time * * * several hours to a man who is accustomed to doing this five or six years every day of his working days. And a man who has been doing this kind of work as a laborer for five or six years, and exposed to all kinds of weather." He further testified as follows:
"THE DEPUTY DIRECTOR: Doctor, if I understand your testimony, you do not say in fact that effort, and the heat, and the humidity, could not under given auspices, be a competent producing cause of a coronary?
THE WITNESS: I have testified for the past fifteen years.
I believe that under given circumstances, stress or strain incidents can be a contributing factor and can be causally related to the onset of a myocardial infarction. And I so also believe today.
THE DEPUTY DIRECTOR: And the question of causal relationship depends upon the fact of the particular case at hand.
THE WITNESS: That is correct."
The determination by the Deputy Director was dated March 17, 1958. This was prior to the date of the decision of the Supreme Court in the case of Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, decided May 26, 1958. The Deputy determined that the evidence did not justify the conclusion that the decedent's death was the result of a coronary occlusion due to "work effort." He held that the evidence established that "the decedent was accustomed to working and on the day in question he performed something that he was accustomed to doing"; that "the working conditions while they may have been somewhat different than usual," were not of such a character "as to place upon the petitioner's heart any greater burden than that which his work ordinarily required." He stated that petitioner failed to satisfy him "by the greater weight of *104 reliable and credible testimony that the decedent suffered his coronary disaster as and when he did and did by reason thereof due to his employment."
The appeal from the Division was argued orally July 18, 1958 before the County Court and the aforesaid judgment of that court from which the present appeal is taken was entered September 4, 1958. The County Court determined that it was "obvious from the evidence that the work decedent was performing was not unusual nor more strenuous or laborious than many of the other duties of his job." The court noted that, by virtue of Ciuba, supra, (which decision as above stated had been rendered subsequent to the dismissal of the petition by the Division in the case at bar) it was no longer the law that recovery cannot be had unless the evidence justifies a finding that the employee was subjected to "unusual strain." Despite the County Court's recognition of the principle enunciated in Ciuba, it found that petitioner had not sustained the burden of proof that decedent's death was causally related to his work.
In making our own evaluation of the evidence we recognize that "`reasonable probability' is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the tendered hypothesis is in all human likelihood the fact. * * * The measure of the weight of the evidence is `the feeling of probability which it engenders.' Joseph v. Passaic Hospital Association, 26 N.J. 557 (1958)." Ciuba, supra, 27 N.J. at pages 139, 140.
It is recognized that, in measuring the weight of the evidence in a case of this type, it is "to be presumed that injury or death from heart disease is the result of natural physiological causes, and the onus is upon the claimant to prove by a preponderance of the probabilities that the employment was a contributing cause of the injury or death." Ciuba, at page 138; Yeomans v. Jersey City, 27 N.J. 496, 509 (1958).
Mr. Justice Heher in Ciuba, 27 N.J. at page 139, cites with approval Larson, Workmen's Compensation Law, §§ *105 38.10, 38.20, 38.30, that "`by accident' is now deemed satisfied in most jurisdictions `either if the cause was of an accidental character or if the effect was the unexpected result of routine performance of the claimant's duties,' and accordingly, `if the strain of claimant's usual exertions causes collapse from heart weakness, back weakness, hernia and the like, the injury is held accidental." Emphasis supplied.
Guided by the principles enunciated in Ciuba, Yeomans, and Bober v. Independent Plating Corp., 28 N.J. 160, 168 (1958), we have from our independent study of the record assessed the evidence and determined that the petitioner has not established by "a preponderance of the probabilities" (Ciuba, 27 N.J. at page 139) that decedent's death was the result of a "service-induced injury."
Our analysis of the evidence reveals certain significant features which lead to the aforesaid conclusion. Our attention is initially directed to the decedent's general poor condition prior to June 11, 1957, as described aforesaid by the water superintendent. We note also the aforesaid significant entries in the hospital record, particularly the portion disclosing decedent's asserted condition for several months preceding June 11, 1957. It is significant that petitioner's attorney refrained from interrogating petitioner with reference to her knowledge of her husband's general health prior to June 11, 1957. Apart from medical witnesses, we believe that no one would be in a better position than she to testify as to Mr. Loew's general health and condition prior to the date in question, particularly so in view of the prior history of precordial pain and distress disclosed by the hospital record.
It is clear that decedent, a laborer, was not under any particular or significant strain at the time of the attack. This is of some significance in resolving the question of causal relationship, even though a finding of the presence of "unusual strain" is no longer an absolute prerequisite for the determination that an injury is work-connected. Although under the Ciuba rule the criterion for recovery is *106 actual causal relationship between the work, whatever its nature, and the heart attack, it is nevertheless of some probative significance in resolving that issue to determine whether what the workman was doing at the time of the attack was something to which he was not accustomed or was of greater strain or burden than that to which he was accustomed. As a matter of fact, in the case at bar, aside from the suggestion of distress after assisting in lifting the second bag of chloride, there is no evidence that decedent was under any strain. It is significant that Dr. Engel, as above noted, specifically rested his conclusion of causal connection between decedent's work and his attack on the "excessive lifting of the bags" and the timing of the complaint of pain. There is no proof that the lifting was excessive. In fact the proof is expressly to the contrary. The work was normal and routine. There was no haste or pressure as in Aromando v. Rubin Bros. Drug Sales Co., 47 N.J. Super. 286 (App. Div. 1957), certification denied 26 N.J. 244 (1958), or in Fink v. City of Paterson, 44 N.J. Super. 129 (App. Div. 1957). From all of the evidence the work was being performed in leisurely fashion. In fact, there is general agreement among petitioner's witnesses that decedent and other workmen were in the garage for a total of 15 minutes, during part of which time they were standing and chatting.
It is noted that Dr. Engel placed very slight emphasis on the temperature and that respondent's doctor discounted its effect entirely.
We note the importance which respondent's doctor attaches to the normal progression of arteriosclerosis and its fatal result apart from trauma or strain in hundreds of cases which have been the subject of study. We have given consideration to the Deputy Director's assignment of greater weight to the opinion of the respondent's medical witness than to that of the doctor appearing for the petitioner.
In reaching our decision in this case we have not considered the divergent opinions expressed by doctors in a variety of cases as to the general relationship of effort and *107 trauma to coronary occlusion. This subject has been the basis of critical comment by the courts in Aromando, supra, 47 N.J. Super. at page 290; in Amend v. Amend, 12 N.J. Super. 425, 440 (Cty. Ct. 1950); and in Weisenbach v. Borough of New Milford, 134 N.J.L. 506 (Sup. Ct. 1946).
It is clear to us in the case at bar petitioner has not borne the onus of proving "by a preponderance of the probabilities that the employment was a contributing cause of the * * * death." No episode of stress or strain has been established. Because thereof the suggested sequence of events which, as a dominant factor in many cases, bespeaks a causal connection, is not here present. Here we have no "immediacy of the attack in relation to the episode of stress," as in Aromando, supra, 47 N.J. Super. at page 293, or in relation to strain as in Roma v. Associated Transport, Inc., 134 N.J.L. 279, 281 (Sup. Ct. 1946). As noted above, we are not implying that an episode of stress or strain is a legal prerequisite for recovery; merely that its absence bears against the petitioner's case on the factual issue of probability of causal relationship between the work and the heart attack.
To allow compensation under the facts of the case at bar would be, in our opinion, to render nugatory the fundamental concept that "an injury suffered during the course of work does not per se entitle one to the benefits of the Workmen's Compensation Act * * *." Henderson v. Celanese Corp., 16 N.J. 208, 212 (1954), and that "an injury, though fatal, suffered in the course of employment but arising solely from natural causes wholly unrelated to an industrial mishap, is not compensable." Snoden v. Watchung Borough, 29 N.J. Super. 41, 45 (App. Div. 1953), affirmed 15 N.J. 376 (1954); cf. Bowen v. Olesky, 20 N.J. 520, 526 (1956). Mr. Justice Oliphant in the case of Kream v. Public Service Coordinated Transport, 24 N.J. 432, 436, 437 (1957), said:
"In the ordinary course of events death normally ensues or results from natural causes. In many actions, both civil and criminal, where *108 the question arises whether the death resulted from other than natural causes, the one who asserts such a proposition has the burden of proving it. Thus, we have held in compensation cases that there is a presumption that death from heart disease results from natural causes and the petitioner has the burden of proving that the death resulted from an accident arising out of and in the course of the employment. In order for the death to be compensable the evidence must preponderate in favor of such tendered hypotheses. Mergel v. New Jersey Conveyors Corp., 14 N.J. 609, 613 (1954).

* * * * * * * *
We realize the difficulty of obtaining proofs in a situation such as this, but the Legislature has not decreed that every death occurring or injury sustained in employment must be compensated by the employer and until such time, the burden of proof established by the cases must be sustained by the petitioner."
The judgment of the County Court is affirmed.