HENRY SCHLEGEL, PETITIONER-PROSECUTOR. v. H. BARON & CO., RESPONDENT-DEFENDANT.

Submitted May 4, 1943—Decided October 22, 1943 .

Before Justices PARKER, HEHER and PERSKIE.

For the prosecutor, *Charles J. Tyne* (*Edward A. Markley* and *Charles W. Broadhurst,* of counsel).

For the defendant, *Edwin Joseph O'Brien* (*Thomas J. Brett,* of counsel).

The opinion of the court was delivered by

HEHER, J. The Workmen's Compensation Bureau found that prosecutor suffered a heart injury by an accident which arose out of and in the course of his employment with defendant, resulting in permanent disability to the extent of 50% of total, and made an award in accordance with *R. S.* 34:15–1, *et seq.* The employer appealed to the Union Court of Common Pleas; and there Judge McGrath ruled that the employee had not sustained the burden of proving a compensable accident, and directed a dismissal of the petition. We are of the same view.

It was incumbent upon prosecutor to adduce evidence in quality sufficient to bring the tendered hypothesis within the realm of probability. *Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *N. J. L.* 533; *Jones* v. *Newark Terminal and Transportation Co.,* 128 *Id.* 190; *affirmed, sub nom. Jones*

v. *Court of Common Pleas of Essex County*, 129 *Id.* 58;
*Riker* v. *John Hancock Mutual Life Insurance Co.*, 129 *Id.*
508. It is requisite in these cases that the evidence be care-
fully scrutinized and assayed in the light of this principle;
otherwise, disability consequent upon disease alone will oft-
times constitute the basis of an award of compensation.

Concededly, the claimant, who was 59 years of age, suf-
fered a coronary thrombosis. This is a condition that ordi-
narily ensues from coronary sclerosis or other morbid state.
At all events, the presumption is that it was due solely to
disease; and the *onus* is on claimant to establish that the
asserted accident was at least a contributory cause without
which the occlusion would not have occurred. Our con-
sidered judgment is that he has failed in this regard.

The claimant was stricken while in the pursuit of his
employment on November 8th, 1940, between 9:00 and 9:30
A. M. He reached the plant at 7:40 A. M., and commenced
work at 8:00 A. M. He was in charge of the shipping and
receiving department; and his work was largely supervisory
and clerical, although on occasion he performed manual
labor. He had two assistants, who did the bulk of the
laborious work. The evidence is convincing that when claim-
ant reached his accustomed station that morning, he com-
plained of physical phenomena which, it is agreed, ordinarily
attend the onset of a coronary thrombosis. These are what
the lay mind regards as symptoms of indigestion.

Claimant testified that between 9:00 and 9:30 A. M., while
in the process of unloading cases of merchandise from a house
truck, he reached for "a very old" corrugated paper case,
which "didn't have very much packing in it," and weighed
with contents 62 pounds, and while "taking it down, it bent
and came down and hit" him "in the chest." He continued:
"I went over on that case and I stayed there and I hollered
for my assistant." But this testimony is markedly incon-
sistent with his subsequent conduct and does not carry con-
viction when deliberated and evaluated in the light of all
the circumstances.

Claimant said that he remained in this prostrate position
for three or four minutes until his assistant, Dulowski,

responded to his call. He explained that during this period he was lying, face down, on the cases on the floor, with his hands "hanging over" them. As Dulowski reached him, he arose and was immediately seized with a "choking pain in the throat" and "pain in the chest." He said he made this statement to Dulowski: "I am hurt. I am going to see Mr. Goodman to give me something." Goodman was a chemist in charge of the employer's laboratory. Claimant admitted that he did not tell Dulowski he had had an accident. He made no mention of the falling case. He called Dulowski as a witness. While the latter was still in defendant's employ, he and claimant had been close friends, and he was plainly not a hostile witness. He testified thus: "Q. And when you got over there he was still leaning over the cases, is that right? A. Yes. Q. Now, when you got over there what happened? A. He gave me the orders with the papers. Q. He gave you the orders? A. Yes. Q. And where did he go? A. He went up the aisle towards the office. Q. What did he say to you, if anything? A. He told me he didn't feel good, he was sick, he didn't feel good or something. I don't know what he said definitely."

On his way to Mr. Goodman, claimant met Mr. Baron, the general manager. He testified that he said to him: "I am sick." He later withdrew this statement, and said that he told Baron he "was hurt and was going down to Mr. Goodman to get a drink to try to get fixed up." It is hardly conceivable that Baron would not have inquired as to the details of the accident if claimant had told him he "was hurt;" and claimant admitted there was no such inquiry. Goodman gave claimant bicarbonate of soda, unquestionably because he told him he had indigestion and had related symptoms of that condition. Claimant admitted that he did not tell Goodman of the alleged accident.

Goodman testified claimant came to him at about 8:30 A. M. on the day in question and complained of a "pain in his chest," and said "he felt it was something he ate the night before and asked me to give him something." He gave him bicarbonate of soda, and he drank it. Claimant returned an hour later and said he "felt very bad and he asked for a

drink of liquor." This request was refused; and the witness called the superintendent, Mr. Balber, and advised that he be taken to a physician. Balber had seen claimant in a plant toilet at 7:45 o'clock that morning, before work commenced, "coughing and gasping." He inquired as to the "trouble," and claimant replied that he "didn't feel so well," no doubt due to the fact, so he said, that he had "had a little too much beer" the night before. Claimant acknowledged that he did not inform Balber of the accident. Balber took him to a physician nearby, Dr. Glasston.

Dr. Glasston examined claimant and forthwith diagnosed the condition as a coronary thrombosis. He had him removed to a hospital and treated him there for three weeks. He testified that, in the course of his initial examination shortly after the seizure, he asked claimant, "What is wrong, or what happened?" and received this reply: "I don't know what happened, but I have a severe pain in my chest." He said claimant complained of "weakness and dizziness." When he concluded his examination, the physician informed him that "something happened to the coronary artery;" and he replied, "Oh, no; that's from too much beer last night." Claimant insisted he was merely suffering from indigestion. Dr. Glasston said further that, since many of the cases which came from defendant's plant involved traumatic injuries, he made specific inquiry as to the details of this occurrence. He asked claimant: "Did you do any heavy lifting or did anything strike you, or were you in the course of any physical labor or mental stress?" The reply was: "No, I don't do any physical work. I am just supervising." He then inquired whether claimant "did anything this morning;" and the answer was: "Not at all. It was shortly after I came to work I was seized with this pain, and anything that was done to relieve me was useless." Claimant added that after he became ill, he went to the toilet and retched in vain, and then secured bicarbonate of soda from Mr. Goodman. The physician finally convinced him that he had a serious heart condition, and he then agreed to enter a hospital. Mr. Balber was present during this examination. He corroborated the physician's testimony. He said that claimant insisted

his distress was due to indigestion, and asked for treatment for that condition. "He insisted that he had eaten something the previous night, and had drank a little to excess, and he thought that was his ailment." It is not contended that there was an objective manifestation of the asserted chest injury. Claimant admitted that during his three weeks of hospitalization under the care of Dr. Glasston, he did not inform him of the accident. He said that, although the physician visited him daily for a time and on alternate days thereafter, he "was too sick to tell him." And he also admitted that he made no mention of an accident when he was first examined by the doctor immediately after the attack. Nor did he inform Mr. Baron, the plant manager, of the accident when he visited him at the hospital. Again, he explained that he was "too sick to tell him."

It is inconceivable that claimant would have failed to inform his attending physician of the accident, if one had occurred, on the occasion of the examination and treatment shortly after the attack, and during the three weeks he was under his care at the hospital. The least informed know that the attending physician's request for the history to aid in diagnosis and treatment calls for the fullest disclosure in the patient's own vital interest. Normal human reactions and behavior are elements to be considered in the appraisement of such evidence.

Apart from this, the taking of bicarbonate of soda is corroborative of the testimony that claimant himself attributed his condition to indigestion. And his own physician, Dr. Newhaus, testified that the onset of a coronary thrombosis is frequently attended by symptoms akin to those of indigestion, and that forty-five minutes to an hour is the usual period between the first of such symptoms and the final collapse.

And discrepancies in the averments of the petition for compensation, a bill of particulars furnished in compliance with defendant's demand, and the evidence adduced at the hearing, are not without significance. In his petition, claimant alleged that: "While lifting and removing cases from tier to be loaded on truck, greatly exerted self to hold onto heavy case, load jerked me over, felt strain, experienced

choking, weakness, &c., was obliged to stop work and taken to hospital." The petition was filed on February 1st, 1941. In the bill of particulars, served on the ensuing March 17th in response to a demand for a detailed description of the accident, claimant reiterated the statements of the petition *supra*. Thus undue exertion and strain were assigned as the causes of the alleged injury. And two medical experts who examined claimant on May 14th, 1941, on behalf of the employer, testified he did not mention a blow on the chest, but spoke of "an unusual amount of activity loading trucks and helping around," and of being required "to work at a rather rapid pace," which was followed by "a severe pressing sensation around his entire lower chest." It is worthy of note that in a written statement given by claimant to the insurance carrier two weeks after the occurrence, and bearing his signature, he denied he suffered an industrial accident, and admitted the two visits testified to by Mr. Goodman after he became ill. His own behavior also lends full credence to the recital which he thus authenticated by his signature.

Claimant cites the corroborative testimony of an alleged eye-witness. He was a truck driver employed by a concern having business relations with the defendant employer; and he testified that he reached the latter's plant at 9:00 A. M. on the day in question, and witnessed the accident a half hour later. His version of the occurrence is far from persuasive. It is in substantial conflict with the circumstances related by claimant and Dulowski. He testified that, when the "carton went against" his chest, claimant "leaned over a carton." The carton "didn't fall;" it "buckled up against his chest;" he thought he had "dropped something." He (the witness) thought "nothing of it," but he "walked over to him" and asked, "What is the matter?" Claimant "mumbled" and "started walking away from me; * * * he started to go before I got over to him." He did not again see claimant, whom he had known for eight years, until he came to his home in August, 1941, to ask him "to be a witness." Meanwhile, he did not tell anyone what he had seen, and he did not even tell claimant on this visit that he had witnessed the mishap. And he said, moreover, that shortly

after its occurrence, Baron entered the shipping room, but he did not tell him what he had observed. He thought "nothing of it at the time." Dulowski was present, he insisted, when claimant was injured, but this is directly contrary to the testimony of both claimant and Dulowski. And, as pointed out, claimant also said that he had lain prostrate on the cases three or four minutes before Dulowski came in response to his call—a circumstance sharply at variance with this witness' testimony. Neither claimant nor Dulowski testified to his presence at the time; indeed, they made no mention of him in their testimony. And there is convincing evidence that he was on another side of the building at the hour of the occurrence, where he could not possibly perceive what had happened. The evidence thus adduced is not of such definitive quality as to overcome the adverse inference reasonably derivable from claimant's own conduct. That betrays an awareness of disease rather than accident as the cause of his seizure.

To hold in these circumstances that claimant's condition was attributable in any degree to an industrial accident would be to ignore the decided preponderance of the evidence to the contrary. The inference that the thrombosis was the consequent of disease alone is persistent and compelling. It is evident that it had set in when claimant commenced work that morning.

The judgment of the Court of Common Pleas is affirmed, without costs.

Mr. Justice Perskie dissents.