AGNES CIUBA, PLAINTIFF-APPELLANT, v. IRVINGTON VARNISH & INSULATOR CO., RESPONDENT-APPELLEE.

Argued March 17, 1958—Decided May 26, 1958.

128

130

Mr. *Herman M. Wilson* argued the cause for appellant.

Mr. *Isidor Kalisch* argued the cause for respondent.

The opinion of the court was delivered by

HEHER, J. We have here a dependency action under the Workmen's Compensation Act, *R. S.* 34:15–7 *et seq.,* brought by the widow of one Frank Ciuba who on April 7, 1955, at the age of 59, suffered an acute myocardial infarction in the course of his employment as a millwright with the defendant corporation at its plant in Irvington, New Jersey, followed by immediate disablement and death ten days later. The attack came shortly after the workman had completed the installation of an oven-drive unit weighing between 200 and 300 pounds.

The deputy director concluded that "the greater weight of probabilities is that the decedent's death resulted from a coronary incident due to progressive heart disease and is not causally related to his employment by reason of any unusual strain or by reason of any occupational disease or hazard"; and the petition for compensation was accordingly dismissed.

The County Court affirmed. The holding there was that "the proofs do not establish that the work being performed was more strenuous than that for which [the worker] had been hired and which he customarily performed or that the work then in hand was done under conditions unusual to his employment," nor the alternative hypothesis that an occupational disease from his exposure to "fumes and heat as the usual conditions attending [his] work  *  *  *

brought about [his] death by reason of their malignant influence upon a heart that was already impaired."

An appeal taken by plaintiff to the Appellate Division of the Superior Court is here by our certification, *sua sponte*.

Ciuba had been continuously employed by defendant as a millwright from October 1938, usually assigned to a group of workers engaged in the maintenance of machinery throughout the plant which required the "set[ting] up [of] all kinds of equipment, all kinds of machines," weighing as much as 500 pounds, on occasion 1,500 pounds, depending upon the mechanical function. It was work that in its very nature called for varying degrees of physical exertion, according to the weight and dimensions of the mechanism to be set up.

The decedent and a fellow employee, Fruzynski, installed the oven-drive unit. The installation process is thus described in the findings of the County Court: the mechanical apparatus was "a new kind of drive shaft geared to the operation of several ovens as a unit * * * supplanting a shaft of another type"; the unit "had to be raised to a height of eight feet so that it could be connected"; the "raising of the mechanism from the floor and connecting it remained to be done when they started work at 8 A. M." on the day of the mishap (the work had begun the day before); a "rope and pulley contrivance and a two-step platform were the only mechanical adjuncts to their efforts"; while the unit was "on the floor they tied the rope around it and, in the words of Fruzynski, 'we start standing up the unit and put it on the first step' "; the steps had "twelve inch risers"; the drive shaft "was then raised to the second step, Fruzynski pulling on the rope with one hand and with his other hand on the unit, while Ciuba lifted with his hands"; the "unit having been raised to the top step, they 'tip[ped] it over straight up"; Fruzynski "then mounted a ladder and again assumed control of the rope, calling upon Ciuba to resume lifting"; "Ciuba responded"; as he "assisted in the raising, he got up on the first step, and pushed the unit up 'about halfway, [and] we tip[ped] it

over on the beam'"; at "the completion of the raising Ciuba's hands were over his head"; "There then followed the work of lining up the unit with the gear, drilling a hole, and connecting it up, all of which took about twenty minutes"; Fruzynski "estimated that the job was finished about 9:40 A. M."

When the work was completed, Fruzynski and Ciuba repaired with their tools to the machine shop, 100 feet away from the room in which the unit had been installed. They were thereupon assigned to other work; and some 15 minutes later Fruzynski returned to the machine shop and there saw Ciuba walking from the "dressing room," on his way home, accompanied by a fellow worker; he had then been stricken.

The oven-drive unit was installed in a room 100 feet by 60 feet known as a "coating tower," containing 14 ovens, seven on either side, through which cloth was passed in the process of applying a plastic coating; the heat within the ovens, said the County Court, "was estimated at 350 degrees"; the oven on which the work was being done was not in use at the time. The operation was carried on between the wall and the oven, an area two feet wide; the ceiling was eight or nine feet above the work level, "thus making the ceiling height there 16 or 17 feet" and 30 feet beyond that point. Fruzynski testified there were uncovered steam pipes along the wall; they were required to place the unit "between the wall and the oven, up about six foot high"; Ciuba lifted "one end," and he, Fruzynski, "was on the top, and pull[ing] the rope"; the temperature, he said, was 30 degrees higher than "outside"; at the time in question, "everybody [was sweating] down there." The foreman, Jeskey, said: "All the coating room jobs any place, they are always warm, * * * that's when you are on the floor. When you go higher, it is warmer." He continued: "[Ciuba had] had harder work, and that wasn't an easy job either. I mean it was in a tight place, * * * that was the only place we could get it in."

Some 15 years before, a physician consulted by the decedent diagnosed his complaint as angina pectoris. But so

far as appears, there had been no symptomatic recurrence of the condition; and his work record shows continuous service of the same character with the defendant employer until he was mortally stricken. There is no suggestion of waning physical strength in the laborious work that fell to his lot, but his family noticed indications of fatigue during the last year of his life.

The plaintiff adduced medical opinion evidence that in all probability working conditions—the heat, cramped quarters and naphtha fumes, combined with physical effort—induced the acute myocardial infarction; there was an undue burden "on the coronary circulation," predisposed as the decedent was by deterioration of the heart and circulatory system and the consequent coronary insufficiency. And the 15-minute interval before the onset of the fatal seizure, the witness said, was in accord with this hypothesis.

There was error in matter of law in the several determinations of the deputy director and the County Court that, for failure of proof of "unusual strain" or the doing of work "more strenuous than that for which [the deceased workman] had been hired and which he customarily performed," the mortal coronary occlusion was not a compensable accident within the intendment of *R. S.* 34:15–7. We hold this to be an illusory criterion of the work-connected injury or death "by accident" made the subject of the statutory compensation benefits.

An "accident" in the legislative sense is an "unlooked for mishap or an untoward event which is not expected or designed"; and such is the case where a heart ravaged by disease succumbs to strain or exertion arising from the doing of the master's work, even though it be but a normal incident of the service, in no sense extraordinary, and such as a sound heart could withstand. It is basic to the statutory policy that, if strain or exertion attending the rendition of the service aggravates or accelerates the progress of a pre-existing physical infirmity or condition due to either trauma or disease, and disability or death ensues, there is a compensable accident and injury. Such is an

untoward event, unintended and unexpected within the concept of the statute. The essential inquiry is whether the disabling injury or death is causally related to strain or exertion attendant on the doing of the master's work. Did the accident come from disease alone, or did the employment contribute to it? *Hentz v. Janssen Dairy Corp.*, 122 *N. J. L.* 494 (*E. & A.* 1939); *Molnar v. American Smelting & Refining Co.*, 127 *N. J. L.* 118 (*Sup. Ct.* 1941), affirmed 128 *N. J. L.* 11 (*E. & A.* 1942). See also *Ciocca v. National Sugar Refining Co.*, 124 *N. J. L.* 329 (*E. & A.* 1940); *Cavanaugh v. Murphy Varnish Co.*, 130 *N. J. L.* 107 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 163 (*E. & A.* 1944).

This is the meaning given the same clause of the English prototype of our statute in *Fenton v. Thorley & Co., Ltd.*, [1903] *A. C.* 443, a construction of our own statute adopted at the very beginning. *Bryant, Adm'x. v. Fissell*, 84 *N. J. L.* 72 (*Sup. Ct.* 1913); *Hall v. Doremus*, 114 *N. J. L.* 47 (*Sup. Ct.* 1934); *Bollinger v. Wagaraw Building Supply Co.*, 122 *N. J. L.* 512 (*E. & A.* 1939).

"Injury by accident" means nothing more than "accidental injury," as the term is popularly used. *Clover, Clayton & Co., Ltd. v. Hughes*, [1910] *A. C.* 242, Lord Macnaghten. There, a fatal rupture of an advanced aneurism of the aorta, caused by strain when the workman was tightening a nut with a spanner, was held to be an "accident" within the meaning of the statute, even though the aneurism was in such an advanced condition that "it might have burst while the man was asleep, and very slight exertion, or strain, would have been sufficient to bring about a rupture." The finding of the County Court in that case was that "the death was caused by a strain arising out of the ordinary work of the deceased operating upon a condition of body which was such as to render the strain fatal." Lord Loreburn, for the House of Lords, said that while the fatal strain was "quite ordinary in this quite ordinary work," it was nevertheless a compensable accident, for there was the requisite "relation of cause and effect between the employment and the accident, as well as between the accident and

the injury." He declared that there is the essential causal connection if "it appears that the employment is one of the contributing causes without which the accident which actually happened would not have happened, and if the accident is one of the contributing causes without which the injury which actually followed would not have followed." And he concluded that the rupture was certainly an "accident" in the statutory sense, for it was an "untoward event" that was not expected or designed. An accident, he affirmed, may be "something going wrong within the human frame itself, such as the straining of a muscle or the breaking of a blood vessel." In considering whether it was an accident which arose out of the workman's employment, he deemed it of no importance that "there was no strain or exertion out of the ordinary." An accident, he said, "arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of health." He found the test to be whether the work, "as a matter of substance, contributed to the accident." And he continued: Did the workman "die from the disease alone or from the disease and employment taken together, looking at it broadly? Looking at it broadly, I say, and free from over-nice conjectures, was it the disease that did it, or did the work he was doing help in any material degree?" And he observed that if "the degree of exertion beyond what is usual had to be considered in these cases, there must be some standard of exertion, varying in every trade." Lord Macnaghten, concurring, said: "The fact that the man's condition predisposed him to such an accident seems to me to be immaterial. The work was ordinary work, but it was too heavy for him."

The doctrine of this case was followed by the House of Lords in *Partridge Jones and John Paton, Ltd. v. James,* [1933] *A. C.* 501, where a fatal attack of angina pectoris, due to the failure of diseased coronary arteries to supply the amount of blood necessary for the heart to function when the workman "was doing his ordinary work in the ordinary

way," was held to be a compensable accident. Lord Buck-master said that since it was found that "the result of the work was the failure of the blood supply resulting in angina pectoris, and that it was because he was engaged in doing his ordinary work in this diseased condition that this failure arose, and that the work and the disease together contributed to the death," there was an accident which arose out of the employment. He read the case of *Clover, Clayton & Co., Ltd. v. Hughes, supra,* as rejecting the theory that it is necessary to show that the workman "has suffered an injury as the result of some definite thing that he did in the course of his work," and that even though the work contributed to the death of a workman who, in the normal course of his work, owing to the imperfect condition of his arteries or whatever other internal organ may have been diseased, breaks down and dies, the case is not within the statute unless one can point to "a specific injury resulting from a specific act."

And in *McArdle v. Swansea Harbour Trust,* 113 *L. T.* 677, 8 *B. W. C. C.* 489 *(Ct. App.,* 1915), another case of death due to a ruptured aneurism, Lord Cozens-Hardy for the Court of Appeal found that the County Court judge had misdirected himself as to the law in considering the test to be whether the workman, at the time of the rupture, was or was not doing work of a light nature. He said that if the rupture occurred by reason of the strain at work, however slight the strain might have been, it was an accident in the statutory view.

In *Stewart v. Wilsons and Clyde Coal Co., Ltd.,* 5 *F.* 120 *(Ct. Sess.* 1902), Lord M'Laren stated the criterion in these words: "If a workman in the reasonable performance of his duties sustains a physiological injury as the result of the work he is engaged in * * * this is accidental injury in the sense of the statute."

█ █ The English interpretation has especial significance here. As indicated, the judgment in the case of *Clover, Clayton & Co., Ltd. v. Hughes, supra,* antedated the adoption of our statute; and it is reasonably to be presumed that our

law-making body had in view the construction theretofore given the identical clause of the English act delineating the class to be benefited by the remedial policy of compensation for work-induced injuries without regard to fault. *Bollinger v. Wagaraw Building Supply Co., supra; Hall v. Doremus, supra; Taylor v. Rector, Wardens and Vestrymen of Christ Church,* 118 *N. J. Eq.* 288 (*E. & A.* 1935). See *Lewis' Sutherland, Statutory Construction* (2d ed.), § 404. And being remedial in nature, the statute is to be liberally construed in keeping with its apparent policy. *Sigley v. Marathon Razor Blade Co., Inc.,* 111 *N. J. L.* 25 (*E. & A.* 1933).

*Seiken v. Todd Dry Dock, Inc.,* 2 *N. J.* 469 (1949), is accordingly overruled. But we reaffirm the holding there that it is to be presumed that injury or death from heart disease is the result of natural physiological causes, and the onus is upon the claimant to prove by a preponderance of the probabilities that the employment was a contributing cause of the injury or death. Of this, more hereafter.

Here, the work in which the decedent was engaged just before the fatal seizure was not a daily performance, but rather was by its very nature intermittent; and the operation itself called for varying degrees of exertion. And the exigencies of the normal pursuit of the master's service in a given field may demand an uncommon measure of strain or exertion. Certainly, the accidental quality of the injury cannot be made to depend upon a distinction so unreal,— *i. e.,* between the "usual" and the "unusual" strain or exertion in the work-performance that is shown to have been the causative agency; in either event, the injury would come by accident arising out of and in the course of the employment; the employment would then be one of the contributing causes without which the injury would not have followed. On reason and principle, considering the clause delineating the class in relation to the obvious legislative policy, the occurrence would be an "unlooked-for mishap" or an "untoward event" not expected or designed. The contrary view

would have the vice of false perception. Said Lord Macnaghten in *Fenton, supra:*

"If a man, in lifting a weight or trying to move something not easily moved, were to strain a muscle, or rick his back, or rupture himself, the mishap in ordinary parlance would be described as an accident. Anybody would say that the man had met with an accident in lifting a weight, or trying to move something too heavy for him."

And in this view there is no sound reason for differentiating heart seizures due to effort and exertion causally related to the employment, *e. g., Lohndorf v. Peper Bros. Paint Co.,* 134 *N. J. L.* 156 (*Sup. Ct.* 1946), affirmed 135 *N. J. L.* 352 (*E. & A.* 1947), from other injuries so induced.

As Professor Larson says, "by accident" is now deemed satisfied in most jurisdictions "either if the cause was of an accidental character or if the effect was the unexpected result of routine performance of the claimant's duties," and accordingly, "if the strain of claimant's usual exertions causes collapse from heart weakness, back weakness, hernia and the like, the injury is held accidental." *Larson, Workmen's Compensation Law,* §§ 38.10, 38.20, 38.30.

In its nature, an exertion-induced injury may be difficult to prove when it involves coronary occlusion, myocarditis or dilatation of the heart. But the issue, after all, as in other civil cases, is whether the burden of proof has been sustained. "Reasonable probability" is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the tendered hypothesis is in all human likelihood the fact. Does the evidence reasonably give rise to a circumstantial inference of the requisite causal relation? Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as "a mere preponderance of probabilities, and, therefore, a sufficient basis for decision." *Jackson v. Delaware, L. & W. R. R. Co.,* 111 *N. J. L.* 487 (*E. & A.* 1933). It need not have the attribute of certainty, but it must be a presumption well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof. The determinative inquiry is whether the evidence demonstrates

the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind. The accepted standard of persuasion is that the determination be probably based on truth. A bare quantitative preponderance is not enough. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion. The measure of the weight of the evidence is "the feeling of probability which it engenders." *Joseph v. Passaic Hospital Association,* 26 *N. J.* 557 (1958).

So assessed, the evidence here sustains as reasonably probable the hypothesis of a service-induced injury. The requisite causal relationship is brought within the bounds of rational inference. The essential question is whether strain or exertion incident to the work accelerated the worker's death. Would his death have occurred when it did if it had not been for the work in which he was engaged? Presumably, he had suffered from heart and arterial insufficiency. There was evidence of lowered stamina for a year before the mortal seizure; but the inference is well-nigh irresistible that physical exertion attending the doing of the work aggravated his disease and weakness of heart and brought on the fatal collapse. The evidence fairly excludes the hypothesis of death as the consequence of disease alone.

True, the occlusion and the exertion may have been a coincidence. But the exertion could have precipitated the occlusion to which the decedent was predisposed by disease; and that such was the case is the probable or more probable hypothesis with reference to the possibility of other hypotheses. Indeed, the existence of a causal relation in these circumstances would seem to be well grounded in common knowledge and experience. Compare *Lohndorf v. Peper Bros. Paint Co., supra.*

The judgment is accordingly reversed; and the cause is remanded with direction to enter judgment for the plaintiff in conformity with the requirements of the compensation act.

BURLING, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice WACHENFELD—1.