65 N.J. Super. 397 (1961)
168 A.2d 62
ELLEN BLACK, PETITIONER-RESPONDENT,
v.
MAHONEY TROAST CONSTRUCTION CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1960.
Decided February 10, 1961.
*400 Before Judges GOLDMANN, FOLEY and MINTZ.
Mr. Isidor Kalisch argued the cause for respondent-appellant.
Mr. Seymour B. Jacobs argued the cause for petitioner-respondent (Mr. David Roskein, attorney; Mr. Jacob L. Balk, of counsel).
The opinion of the court was delivered by FOLEY, J.A.D.
The Workmen's Compensation Division denied petitioner, widow of an employee of respondent, recovery of death benefits provided by the Workmen's Compensation Act. R.S. 34:15-7. The County Court reversed, awarded judgment to the petitioner, and respondent appeals.
The sole question presented is whether the death was causally related to the employment. The scope of our review, of course, requires that we weigh the evidence to determine whether a compensable accident was proved, paying due respect to the views expressed on both facts and law by the Division and the County Court. Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958).
On July 16, 1958 shortly after 5:00 P.M. decedent, James Black, age 57, regularly employed by respondent during the hours of 4:00 P.M. to midnight as a guard or watchman was found lying on the floor of a store premises which was under construction by respondent. He was taken by ambulance to the Hackensack Memorial Hospital where he died on July 19, 1958. Concededly decedent had been in poor health for many years. While in service during World War II he sustained a double hernia. Subsequent efforts to repair it were unsuccessful and, as a result, his ordinary physical efforts were severely handicapped. He also suffered from chronic bronchitis of long standing which caused him to cough incessantly. About two years before his death he became afflicted with headaches of more or less constant recurrence. These increased in intensity during the last *401 two weeks of his life. For "five or seven" years he had complained to his wife of chest pains. These also worsened toward the end.
On July 16, 1958 he left for work at 3:00 P.M. as usual. It was a hot day. The temperature was then 87 degrees and the relative humidity 60 per cent. As was his custom, he drove to a gasoline station near the construction project which he guarded, arriving at about 3:30 P.M. According to witnesses he then appeared to be "his usual self." After a brief conversation with employees at the station, he went to a trailer which served as a company office, and there awaited the commencement of his work day.
A soda dispensing machine was maintained in the gasoline station which was patronized by mechanics working on the construction project. It was customary for them to take the soda to their work and to leave empty soda bottles in various parts of the building. Evidently it was part of decedent's work routine to gather these bottles in "groups" in the course of his rounds. Subsequently they would be picked up by William Westervelt, the owner or manager of the gasoline station.
On the day in question Westervelt went to the building at about 5:30 P.M. to gather the empty bottles. Upon his arrival he found decedent lying on the floor unconscious. The groups of bottles had not been assembled. Westervelt returned immediately to the station, told a friend, Bernard Kauffmann, of decedent's plight and telephoned for an ambulance, and for the police. Kauffmann, meanwhile, ran to the building and attempted to revive decedent with a wet towel. He appeared to be unconscious but when Kauffmann spoke to him "he opened up his eyes and he said he fell" and that "he was carrying some bottles and dropped them." Police Officer Michael D. Bellew arrived on the scene shortly thereafter. He testified that he found decedent conscious and that he conversed with him but could not recall what was said. There was some variance in the recollections of Westervelt, Kauffmann and Bellew with reference to the *402 number, and the condition of soda bottles which were on the floor area immediately surrounding decedent. Westervelt testified that he did not then recall that there were any bottles, but that there might have been one or two, since he had previously given a written statement to this effect. Kauffmann recalled that there were a "couple" of bottles, one broken. Bellew thought that there were two unbroken "Coke" bottles and some "portions of broken bottles" in front of Black's feet "a few feet away." Although the fact is of no determinative consequence, we think it a reasonable deduction that in accordance with his daily routine decedent was carrying one or two empty soda bottles at the time he was stricken.
The cause of decedent's death was not in essential dispute. Dr. Donald E. Brown, director of laboratories of the Hackensack Hospital, performed an autopsy of decedent's body at the Hackensack Hospital Morgue shortly after death occurred. He testified that the death had resulted from the softening of an area of the brain, brought about by a shutting off of the blood supply thereto, which was the product of an embolus emanating from the chronically diseased heart. The post mortem examination also disclosed an interstitial hemorrhage in the brain. There was some divergence of opinion between Dr. Saul Lieb, who testified for petitioner, and Dr. Brown and Dr. Yaguda, who testified for respondent, as to whether this had occurred immediately prior to or simultaneously with decedent's collapse on July 16, or whether it was a terminal incident. Dr. Lieb took the position that it was associated with decedent's work efforts; respondent's doctors said that the time of its occurrence was purely conjectural. However this may be, the medical witnesses were in agreement that the primary cause of death was a syndrome of progressive, pre-existing idiopathic diseases which culminated in the cerebrovascular incident described by Dr. Brown. The central issue, therefore, was not the precise nature of the morbid condition which caused decedent to collapse on July 16, and which subsequently resulted *403 in his death, but rather, whether decedent's employment contributed to his demise.
The burden is on a petitioner to establish that he suffered an accident arising out of and in the course of the employment. In a case of one suffering from a pre-existing disease which is potentially fatal, and death ensues, it is presumed that the death is the result of natural physiological causes, and the onus is on the claimant to prove by a preponderance of probabilities that the employment was a contributing cause of same. Ciuba v. Irvington Varnish and Insulator Co., 27 N.J. 127 (1958). A preponderance of probabilities may be established by circumstantial evidence which need not have the attribute of certainty, yet must evoke a presumption well founded in reason and logic, as distinguished from guess or conjecture. Ibid. However "accident" and "employment" are not synonymous. Ibid. Thus, it is encumbent upon plaintiff to prove, circumstantially or otherwise, an event or happening beyond the mere employment itself. Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156 (Sup. Ct. 1946). See also Ciuba, supra; Jacobs v. Kaplan, 56 N.J. Super. 157 (App. Div. 1959).
Petitioner relied entirely upon the opinion of Dr. Lieb to establish a contributory causal connection between the employment and the death. This opinion was given in response to a hypothetical question which included an assumption that decedent while making his rounds:
"stooped over on several occasions in order to pick up bottles, and that while either in the act of stooping down to pick up a bottle or while straightening out after picking up a bottle or immediately thereafter while carrying the bottles to the depository where Mr. Westervelt could pick them up, something happened to him which caused him to fall to the ground unconscious * * *."
As we have already noted, we think there was sufficient evidence in the case to justify the inference that at the time decedent fell he was carrying soda bottles, which he had probably picked up from the floor. But the same cannot *404 be said of the factual conclusion that it was reasonably inferable from the proof that the decedent had stooped "several" times or that he was stricken while so doing or as he was "straightening out." The only suggestion that the "stooping" was directly proved (and even this did not furnish a basis for relating it to decedent's collapse as definitively as the hypothetical question implied) was contained in the history given by decedent's widow to the Hackensack Hospital authorities that the patient while "bending over to pick an object off the ground" collapsed. Plainly this hearsay statement was not legal evidence of the fact sought to be proved. Person v. Firemen's Insurance Co., 126 N.J.L. 330, 333 (Sup. Ct. 1941), affirmed 127 N.J.L. 229 (E. & A. 1941). Nor in our judgment was the quoted portion of the hypothesis supported by proven circumstances of sufficient cogency to lead a reasonably cautious mind to the conclusion that the decedent had "stooped several" times and had collapsed while so doing, or "while straightening out." Assuming that decedent had one or two empty bottles in his hands when he collapsed, it does not follow by rational inference that he had stooped several times to collect them. And the supposition that he had stooped to "group" bottles so that Westervelt might collect them, is negated by the testimony of the latter that when he arrived the grouping of bottles had not yet commenced. Timely objection was made to the inclusion of the assumption of "stooping" in the hypothetical question, but it was permitted to remain and Dr. Lieb in offering the opinion that the exertion of decedent's work duties contributed to the onset of the cerebral attack seemingly was influenced thereby, as he testified:
"The fact that the work that he did of picking up the bottles and carrying them was done under circumstances where he already was suffering from the burden of two large, massive inguinal herniae which must have interfered with this work.

* * * * * * * *
In my opinion, when he did this work of stooping over several times, picking up the bottles and carrying them, and this was followed by the collapse, that represented the acute brain softening." *405 and when asked on cross-examination what particular circumstances of the work resulted in an insufficient blood supply in the brain the doctor replied:
"Well, in this particular case the effort described, the picking up of bottles and the carrying them, his having to struggle against two massive herniae while he did this work; the heat of the day and the chronic lung condition. All these things."
To the extent that Dr. Lieb's opinion of work connection between the employment and the cerebral attack was dependent upon the assumption that decedent was stricken after stooping several times, the absence of evidential support of this premise seriously impaired, if it did not destroy, the benefit derived from his answer since the facts made known to a witness by hypothetical question must be facts in evidence. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 306 (1954).
As we have noted, the doctor also laid stress on the heat of the day, as a factor contributing to the decedent's collapse. The evidence in the case disclosed that at 5:00 P.M. the outside temperature in the general area (as distinguished from the temperature in respondent's building) was 89 degrees and the relative humidity 58 per cent. While it may be said that excessive heat peculiar to the place of employment which results in the collapse of an employee should be regarded as a condition "beyond the mere employment itself," or that a physical breakdown resulting from the superimposition of oppressively hot weather on the performance of rigorous duties would be a compensable accident, the absence of a showing, directly or inferentially, that had the decedent herein been on the street, or at home, the temperature of the day would have been less oppressive, or that his duties entailed physical exertion, the adverse effects of which were intensified by hot weather, removes the temperature factor from consideration as a condition "beyond the mere employment itself."
But we think there was another and more fundamental weakness in the foundation of Dr. Lieb's opinion which *406 profoundly affects its probative value as a legal basis upon which to found a judgment in petitioner's favor. Although the doctor clung to the hypothesis submitted to him on direct examination, and based his opinion thereon, by his own words it became evident on cross-examination that deeply rooted in his thinking and pervasive of his opinion was the idea that if during the hours of employment an employee collapses in the course of any physical activity, however slight, and even of a character inhering in the ordinary demands of daily living, the doctor would deem such collapse to be work connected. This medico-legal philosophy is best displayed by reference to the record:
"Q. Doctor, as I understand your testimony, the only way this man's condition could not be causally related to the employment is if he were sitting stark still, doing absolutely nothing?
A. In other words, the only way it would not be related to his employment is if he were not working, if he were doing nothing.
Q. If he did absolutely nothing. In other words, if he were not even employed?
A. If he were not employed, of course there would be no causal relationship.
Q. Doctor, if the man were walking down the front walk of his apartment to the car, this could have hit him. The same thing could coincidentally have happened if he were walking along a level surface while at work. It could have hit him in either place?
A. Of course, it could have hit him in either place under similar circumstances, yes.
Q. What would those circumstances be, sir?
A. Well, the heat of the day, the hernia, the lung condition. If he were walking out of his apartment, as you say, under similar circumstances and he dropped due to this type of cerebrovascular accident, I would say all these factors contributed to his dropping." (Emphasis added)
While in a case of this kind it is the function of the medical witnesses to present their views concerning the causal connection between the employment and the injury in terms of probability, the ultimate determination of whether the employee suffered an "accident arising out of and in the course of his employment" is exclusively within the judicial domain. While frequently the issue is factual in *407 nature, the legal effect of the determination is controlled by the applicable law. Thus, in assessing the weight to be accorded expert testimony, the court is concerned not with the credibility of the witnesses, but must appraise the opinions given, in light of established standards of legal liability. In short, the question of liability is one of law  not medicine  although medical evidence may furnish the basis for the determinative judicial answer. Cf. Olivera v. Hatco Chemical Co., 55 N.J. Super. 336, 345-346 (App. Div. 1959), certification denied 30 N.J. 557 (1959).
The concepts expressed by Dr. Lieb clearly displayed a lack of perception of the respective roles of the physician and the judge in the compensation scheme, and he so intermixed his personal views of what the law should be with the medical problem with which he was confronted, as to foster the suspicion that, unwittingly perhaps, he tailored his medical conclusion to fit his understanding of controlling legal principles.
In Jacobs v. Kaplan, supra (in which the same doctor testified in similar vein), noting that each case must be decided on its own facts, we held that in order to be compensable the job activity resulting in a heart attack must "entail greater exertion than the ordinary wear and tear of life," and pointed out that if an award should be upheld where all that is shown is that "a heart has deteriorated so that any exertion becomes an overexertion, where the mere circumstance that the employee was engaged in some kind of physical labor is what impels the doctors to testify that his work caused his death," we would have reached a point "where all that is necessary to sustain an award is that the employee shall have died of heart disease." See Burris v. Lewis, 2 N.Y.2d 323, 160 N.Y.S.2d 853, 141 N.E.2d 424 (Ct. App. 1957).
We find the holding in Jacobs to have full application to the case sub judice. Eliminating from consideration the repeated stooping incidents, of which there was no proof, the picture here presented is one of an employee, at all times *408 physically handicapped, who collapsed in the course of his employment while walking on a hot day with two empty soda bottles in his hands. The heat of the day, as we have pointed out, was not indigenous to the place of work, nor peculiar to him, but was a discomfort which was commonly suffered by all persons in the area. Walking is perhaps the commonest form of every day human activity; the weight of two empty soda bottles is minimal, and common sense would be tortured if the weight of the bottles were regarded as a factor contributing to decedent's attack.
We are satisfied that upon petitioner's own showing the job activity in which decedent was engaged when he collapsed did not entail greater exertion than that attending the ordinary wear and tear of life and so his collapse was not "an event or happening beyond the mere employment itself." Cf. Loew v. Borough of Union Beach, 56 N.J. Super. 93 (App. Div. 1959).
Our views are fortified by the testimony of Doctors Brown and Yaguda. Both insisted that the cerebrovascular accident suffered by decedent was entirely idiopathic in origin and was completely unconnected with the employee's activities even as they were described in petitioner's hypothetical question. The measure of the weight of the evidence is the feeling of probability which it engenders. Joseph v. Passaic Hospital Association, 26 N.J. 557 (1958). Our consideration of the entire case engenders no feeling of probability that decedent's simple duties played even the slightest part in his collapse. On the contrary, we are firmly convinced that the fatal attack was the inevitable climax of the natural progress of a combination of long standing disorders, and merely coincidental with the hours in which he performed his employment duties.
The judgment of the County Court is reversed and the judgment of the Workmen's Compensation Division is reinstated.