78 N.J. Super. 545 (1963)
189 A.2d 733
IN THE MATTER OF THE ESTATE OF JOSEPH A. BENCEL, ALLEGED TO BE DECEASED.
Superior Court of New Jersey, Appellate Division.
Submitted March 11, 1963.
Decided March 29, 1963.
*546 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. John A. Wyckoff appearing for appellant Stella E. Bencel (Messrs. James and Wyckoff, attorneys; Mr. Wyckoff, of counsel and on the brief).
Mr. Bernard Chazen, appearing amicus curiae (Messrs. Baker, Garber & Chazen, attorneys; Mr. Nathan Baker and Mr. Chazen, of counsel).
The opinion of the court was delivered by PRICE, S.J.A.D.
The instant appeal seeks the reversal of a judgment of the County Court, Probate Division, denying an application by plaintiff Stella E. Bencel for the entry of a judgment declaring her husband, Joseph A. Bencel, to be dead. Pursuant to an order of this court, the attorney of the respective next of kin of Thomas Joseph Bencel, Lewis George Batson, Jr., Michael J. Husti and George Monti, was permitted to participate in this appeal as amicus curiae.
The trial court determined that plaintiff had failed, both factually and legally, to establish her case. We disagree.
We have considered the evidence hereinafter recited and, pursuant to the authority of R.R. 4:53-1, have made our own findings of fact. Nowhere in the record is there any challenge of the "credibility of the witnesses." We are fully convinced that the evidence established that on July 19, 1961 the five men above-mentioned, together with one Michael Simson, *547 owner and operator of a motor boat, "One More," left Brielle by said boat for a day's deep-sea fishing trip off the coast of New Jersey. The fishing grounds to which they were planning to go were in excess of 16 miles offshore. The men have not since been seen alive and their bodies have not been found.
The proceedings in the County Court were initiated by the filing of a complaint by Stella E. Bencel aforesaid, on the basis of which the court issued an order, directed to Barbara Simson, wife of Michael Simson, and to various life insurance companies which had issued policies on the life of plaintiff's husband, requiring that they show cause "why a judgment should not be rendered declaring Joseph A. Bencel to be dead." On the return of said order on June 8, 1962 no one other than plaintiff's counsel appeared. Parenthetically, it is noted that all of the aforesaid life insurance policies were honored by payment of the proceeds thereof to plaintiff as the named beneficiary thereof on the "death" of her husband.
Although the insurance companies have made such payments, the instant appeal from the adverse judgment of the County Court is prosecuted because of the detrimental effect of the judgment in other areas vital to appellant. For similar reasons, those who have been granted the right to participate in the appeal as aforesaid join in seeking a reversal of the judgment as improvidently entered. It is asserted that in view of the aforesaid judgment and the consequent present inability of Stella Bencel to secure appointment as personal representative of her husband's estate, "her rights and consequently those of the other survivors * * * are in jeopardy, and substantial and irremediable prejudice may result." In this connection it is emphasized that in pending litigation in the United States District Court, stemming from the alleged deaths of the occupants of the boat, plaintiff is jeopardized by the refusal of the County Court in the instant case to adjudge that the proofs submitted warranted a finding that the said Joseph A. Bencel is dead. The following statement, descriptive of that litigation, appears in the brief submitted by counsel, amicus curiae:
*548 "There is presently pending in the United States District Court an action based on Wrongful Death on behalf of Rose H. Bencel, Margaret Ann Batson, Mary Husti Vegh, and Julia Monti. There is presently in issue in the Federal Court proceeding the status of these parties as well as the status of Mrs. Simson [the aforesaid Barbara Simson] who seeks to limit liability under 46 U.S.C.A. 183. There is a two year limitation period in both the Death on the High Seas Act. 46 U.S.C.A. § 763 and in N.J.S.A. 2:31-3."
The following amplification of said statement appears in an affidavit of counsel submitted on his application to be admitted amicus curiae:
"On behalf of our clients in the admiralty litigation we submit that insofar as their rights accrue under the Death on the High Seas Act, they are required by that statute to bring an action within two years of the date of death. The dilemma they face is one where the Admiralty Court may find they have no standing.
The inability of the widows to obtain letters of administration involves very serious problems for them and for their children. Must they wait seven years before they can pursue their remedies under the appropriate death act? There is a question whether they might not be barred after two years. * * * Certainly the courts must be concerned with a situation where an action would have to lay dormant for seven years and a litigant deprived of her rights."
In addition, it is asserted that the inability of appellants, and those joining her on appeal, to obtain letters of administration involve other detrimental results, which we find no need to recite.
The County Court, in refusing to enter a judgment declaring the death of Joseph A. Bencel, expressed its reason therefore in part as follows:
"I can't agree with counsel that there is an actual death in this case. Actual death in this State means that somebody has seen the person that has died and has identified him. That is not the situation here. We have no such testimony. Nobody has seen Joseph Bencel so that therefore there is nothing left but to rely on a presumption, so the question is as to whether or not this Court should presume that he is dead."
The trial judge, in his opinion, after referring to the provisions of N.J.S. 3A:40-1 and N.J.S. 2A:83-4, and *549 to the decision of this court in In re Zwiebel's Estate, 3 N.J. Super. 35 (App. Div. 1949), recited the proofs presented on the aforesaid order to show cause. He determined that the evidence was insufficient to support a finding that the said Joseph A. Bencel "was on the boat" when it left the Brielle dock; that there was "no testimony * * * that these men were out on the ocean * * *." He added:
"It is obvious that there was no proof of death. In other words, there has been no eye witness to it to say that Joseph Bencel is dead. To say that Joseph Bencel is dead is to presume a great number of things. Number one is the biggest presumption, that he was on the boat. As I indicated to you before. there is no presumption of that whatsoever. There is no presumption that any of these six men were on the boat."
Proofs received by the court on the return date of the aforesaid order to show cause included evidence that Joseph Bencel, his brother Thomas Joseph Bencel, the latter's brother-in-law, Michael Husti, George Monti and Louis Batson left their homes on July 18, 1961 to go fishing together out of Brielle on the early morning of July 19. The scheduled trip was to be taken on the aforesaid motor boat owned by Simson, docked at the Hoffman Anchorage at Brielle. Simson, five men, and the boat "One More" were seen at the Anchorage that night, and Simson told the owner of the pier that he was going fishing the next day with the five men to "Barnegat Ridge." That area, the record shows, is located "approximately 22 to 25 miles" from Barnegat Inlet and about "16 and a half miles offshore." The boat left at "5 o'clock the following morning," July 19, and did not "return to the dock."
When nothing had been heard from the missing men by July 20, and the automobile in which they had come to Brielle remained "parked in the yard" at the Anchorage, an extensive search for the boat and the men was initiated. It was conducted by the United States Coast Guard over an ocean area ranging from Rhode Island to the "Maryland-Delaware line." The search was coordinated and combined *550 with an exhaustive search by a task force of the United States Navy, using an aircraft carrier, planes and helicopters. Approximately 78,000 square miles of ocean area were searched during a ten-day period commencing July 20, 1961, all with negative results. On August 18, 1961 occupants of a fishing boat found "a piece of wreckage" about "12 miles off of Barnegat." The "wreckage" was brought to the "Barnegat Life Boat Station" and there positively identified as part of the "bow section" of the missing boat. The salvaged portion was described as "a piece of the bow, including about 18 feet of the gunwales, on either side of the boat." The section showed evidence of scorching and burning.
A lieutenant commander, attached to the Marine Inspection Office of the Coast Guard at New York, testified in detail with reference to the aforesaid search, and the identification of the portion of the boat. He presented his expert view as to the cause of the loss and disappearance of the boat and its occupants. He stated that his report, made on August 30, 1961, included the following:
"On the basis of the information I had I concluded that the boat disappeared in an area off Barnegat. I concluded that the wreckage found in that area was that of the One More. I concluded that she suffered a fire and as a result of the damage sustained the boat sank and I lastly concluded that all six persons on board the boat were missing and must be presumed dead for the purposes of our procedures."
The crux of the instant appeal is whether the proofs and the reasonable inferences to be drawn therefrom, in light of the applicable law, demonstrate the death of Joseph Bencel. As heretofore stated, we conclude that they do.
In passing, we record the fact that our order, permitting the filing of a brief by counsel as amicus curiae, also granted him the right to include in the appendix an affidavit of one Raymond Caire. This was done. The affiant states therein that on the evening of July 18, 1961 at the Anchorage at Brielle he had seen Simson with "4 or 5 men" who were to compose his "tuna fishing" party the next day; that he *551 (Caire) was also going fishing in the Barnegat area at the same time; that before dawn on July 19, 1961 he talked by radio from his boat with Simson on the latter's boat before leaving the dock, as they planned to use that medium of communication during the day "in case either one of us would catch fish, in which event we would notify the other to report the location"; that Simson's boat preceded Caire's boat out of the Anchorage and after about "an hour and three-quarters" at sea his (Caire's boat) passed "within 100 yards of the port side of the `One More'"; that he (Caire) saw "at least four men in the small cockpit" of the boat; that later in the day he tried "4 or 5 times" unsuccessfully to reach Simson by radio and had "no further contact" with Simson or his boat.
Although the lieutenant commander attached to the Marine Inspection Office of the Coast Guard as aforesaid had learned of the information possessed by Caire and referred to the latter in his testimony before the trial court, the facts set forth in the foregoing affidavit were not presented to the court. Consequently we have not based our decision on the additional facts so recorded and have rested our findings on the evidence before the trial court and the inferences which we feel may legitimately be drawn therefrom.
In order to properly assess the bases for the trial court's ruling we direct our attention to other portions of its opinion in which it amplified the views which we have hereinabove quoted. Particularly noting the trial judge's asserted reliance on In re Zwiebel's Estate, supra, we are of the opinion that he erred in deeming that the cited case controls the disposition of the case at bar. The trial judge stated that he perceived no "difference between the case before the Court and the Zwiebel case." However, an examination of the opinion in Zwiebel reveals that following the disappearance of Zwiebel, his automobile was found parked on a river bridge with his clothes, money, and other personal property in the car. A search for him, which included the dredging of the river area, proved fruitless. In the cited case there was no *552 "special peril" involved and the facts which are recited in the opinion (at pp. 36-38) do not exclude the possibility that Zwiebel's disappearance was by his own contrivance. In the case at bar, however, we hold that the only logical conclusion from the proofs is that Bencel's disappearance (and that of his companions) was the result of the perilous circumstances to which they undoubtedly were exposed by the destruction of the boat at sea, and that their deaths ensued by reason thereof.
Interpreting Zwiebel, the trial court in the case at bar said that the opinion "rejected the doctrine of the special peril * * * so that the only thing left in this State is actual death, certification under the federal act [not here involved] * * * and seven years absence." We find nothing in Zwiebel which specifically so states. As above noted, Zwiebel was not a "special peril" case. Neither counsel therein nor the court so considered it (at pp. 38-39), and any comment in that case referable to the "special peril doctrine" must be considered dictum.
In Lukens v. Camden Trust Company, 2 N.J. Super. 214 (Ch. Div. 1948), a case which did involve the "special peril doctrine," Judge Berry said:
"As already stated, counsel for Sarah Showaker contends that Captain Beneke must be presumed to be still alive because the seven year period fixed by the statute has not elapsed, and he contends that the so-called `special peril' doctrine has not been recognized in this State. In this contention I feel that he is in error. I have already quoted the language of Chancellor Green in Clarke's Ex'rs v. Canfield, supra [15 N.J. Eq. 119], to the effect that there may be circumstances creating a presumption in fact of the death of an absent party within the seven year period. That, in my judgment, is a recognition of the `special peril' doctrine, and that was as early as 1862. That doctrine was not then disapproved, nor, so far as my research discloses, has it even been disapproved by any New Jersey court. On the contrary, in In re Sternkopf's Will, 1906, 72 N.J. Eq. 356, at p. 359, 65 A. 177, 178, Chancellor Magie, sitting as Ordinary, said:
`While it is true that, upon proof of the existence of a person at a particular time, it must be presumed that he continued to exist thereafter until his death is proved, it has never been conceived that the proof of death must necessarily be direct. Obviously, upon proof *553 of circumstances raising a counter presumption, his death may be found. Thus, if he embarked on a vessel which was never afterward heard from, or which was proved to have been shipwrecked, at least under circumstances indicating the loss of all on board, there would be a question, after a reasonable time had elapsed, during which he had not been heard from, whether the presumption of the continuance of his life had not been overcome by the counter presumption of his death in the shipwreck.' (Italics mine.)
While in that case it was not necessary to apply the `special peril' doctrine, because of a lapse of more than seven years, it is nevertheless a recognition, and, it seems to me, an approval of that doctrine." (Lukens, supra, at pp. 227-8)
We are in accord with the aforesaid holding and deem the principle therein enunciated applicable to the case at bar. We are not in accord with the trial court's "conclusion" in the instant case that in this State "there must be a seven years absence after diligent inquiry before there may be a presumption of death."
Moreover, we are of the opinion that the evidence adduced in the instant case and the legitimate inferences to be drawn therefrom, warrant a presumption that Bencel is dead. We disagree with the trial court's above-quoted holding that "actual death in this State means that somebody has seen the person that has died and has identified him." No such limited definition is acceptable. Circumstantial evidence, from which the fact of death may legitimately be inferred, will suffice. We find such evidence here present. Cf. Jochim v. Montrose Chemical Co., 3 N.J. 5, 8 (1949); Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 274-275 (1958); and Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 139-140 (1958).
The judgment of the County Court is reversed. The presumptive death of Joseph A. Bencel is hereby declared to have occurred as of July 19, 1961. No costs are allowed on this appeal.