Joan EVERS, Lee Evers, the Estate of Otto Evers, Joan Evers, Guardian ad litem and Joan Evers, Administratrix ad Prosequendum, Plaintiffs,

v.

EVERS MARINE SERVICE, INC., Brown Minneapolis Tank Company, and Rodermond Industries, Inc., Defendants.

Civ. No. 79–3160.

United States District Court,
D. New Jersey.

April 17, 1980.

Johnson & Long by Gerard F. Long, Somerville, N. J., for plaintiffs.

Gurry, Conlan, McHugh & Mead by Thomas P. McHugh, So. Orange, N. J., for defendant Evers Marine Service, Inc.

Riker, Danzig, Scherer & Hyland by Michael K. Furey, Newark, N. J., for defendant Brown Minneapolis Tank Co.

McCarter & English by Thomas F. Daly, Newark, N. J., for defendant Rodermond Industries, Inc.

OPINION

BIUNNO, District Judge.

The 5-count complaint in this case centers on the fate of a tug boat, the Chippewa II, and the crew aboard it, including its captain, Otto Evers. The Chippewa II evidently was last heard from on January 5, 1976, at about 11 AM when Otto Evers radioed Brown Minneapolis Tank Co. (Brown) in Minneapolis to report that he was off Key West, Florida, and was headed directly across the Gulf of Mexico for New Orleans because the vessel was so far behind schedule, rather than proceeding along the coast

as first planned. Evers said he was encountering seas up to 7 feet but that they were no worse than what had been encountered on the trip down the east coast to Florida and felt the tug could handle them with no problem. He gave an estimated time of arrival (ETA) of late January 8 or early January 9, 1976 for New Orleans, and said he would contact Brown every morning via marine operator to give progress reports. The straight line distance from the Keys to New Orleans is about 450 miles. From 11 AM January 5 to 11 AM January 9, 1976, is 4 days or 96 hours and would involve an average speed of about 4.69 miles per hour. The Chippewa II was capable of a top speed of about 12 knots in smooth water. It was travelling alone, without tow.

The Chippewa II was never heard from again, so far as the papers presented indicate. Brown tried to initiate contact with the tug every day from January 6 to January 9, 1976, after failure to receive progress reports, but without success. Brown officially notified the U.S. Coast Guard Rescue Coordination Center at New Orleans on January 9 at 4:35 PM (3:35 PM EST) when the tug failed to appear.

The Coast Guard immediately began broadcasting periodically to all naval and merchant vessels crossing the Gulf. A description of Chippewa II was given. All vessels were asked to keep a sharp lookout and to report any sightings. A land search was also initiated of all marinas and waterfront facilities from Key West to New Orleans, to check whether the tug had landed at some intermediate point.

A full air/sea search was initiated January 11, 1976 after a check of all land facilities revealed no sightings of the tug. The search involved units of the Coast Guard, Navy and Air Force, and continued through January 16, 1976, including night searches by radar. There were 40 aircraft sorties for a total of 218.9 search hours covering a total of nearly 228,000 square miles. No debris that could be identified as coming from the Chippewa II was sighted.

An ocean going tug, the Atlantic Star, had departed Port Everglades at 11:20 AM, January 5, 1976 bound for New Orleans with a light barge in tow. At departure there was a strong breeze with 5 to 6 foot seas from the east. At 4:25 PM January 6, the Atlantic Star was off Dry Tortugas in 3 to 4 foot seas and a wind of 15 knots. By 9 PM the seas were 5 to 6 feet in winds of 25 knots. At 10 AM January 7, the Atlantic Star was at position 26–15 N, 85–20 W, making 9.5 knots in calm winds and flat seas. At 3 AM January 8, it encountered a full Northwest gale with 12 to 15 foot seas about 80 miles southeast of Southwest Pass. The storm moderated at 5 AM January 9 and the tug and tow reached Southwest Pass Buoy at 8:25 AM January 9, 1976. During this trip, the vessel monitored channels 13 and 16 VHF/FM, and also 2182 KHZ but never heard any distress calls. The captain of the Atlantic Star personally knew Otto Evers and the Chippewa II but did not know he was in the area. Knowing the capabilities of the Chippewa II, he felt the Atlantic Star should have overtaken the Chippewa II before New Orleans if it had remained afloat and on course.

Inquiry made to Cuban authorities through the Swiss Embassy revealed that no trace of the Chippewa II or any of its crew members had shown up in Cuba or otherwise had come to their attention.

The Chippewa II was a welded steel, single screw, diesel propelled towing vessel built in Brooklyn in 1941 as one of a class of tugboats specifically designed for service on the Erie Barge Canal system in New York. It was of narrow breadth, with high center of gravity, features that made it "tender", i. e., subject to capsizing if the helm were thrown over suddenly at high speed. No record of stability tests was found. It was not subject to U.S. Coast Guard inspection and certification. It was not built to the design specifications of any recognized classification society. For these reasons, the only surveys of the vessel were for insurance purposes. Since it was under 150 gross tons, the vessel was not subject to load line requirements and was never assigned any type of load line.

Otto Evers bought Chippewa II in February, 1973 (presumably through Evers Marine Services, Inc.). He had been a truck driver and mechanic until 1967 when he first began working as a tugboat deckhand.

He operated Chippewa II in New York Harbor and Long Island Sound, except for one trip to Providence, Rhode Island via Long Island and Block Island Sounds, and for one trip to Wilmington, Del. and Atlantic City, N.J. Except for these two trips, Evers had no ocean or coastwise experience. He also belonged to the Coast Guard Auxiliary for 7 years and had just been elected Commander of Flotilla 45, to take effect January 1, 1976. He had been very active and was reputed to be a good sailor.

Evers had been low bidder on a proposal to provide an ocean-going tug to tow two empty fuel oil barges from New Orleans, La. to the U.S. Naval Station at Guantanamo Bay, Cuba. The contract for this was entered into on December 8, 1975 with Brown. The original schedule called for arrival at New Orleans by December 20, 1975 to commence the tow, but the vessel did not leave New York until December 21, 1975.

In preparation for the job, a condition and value survey was conducted November 18, 1975 by Hull and Cargo Surveyors of New York. The surveyors were asked to survey for insurance purposes but not for suitability for a specific job. After the survey, an insurance underwriter asked for a recommendation as to suitability for ocean work, and the surveyor advised against insuring it for such work.

No hull or liability insurance could be obtained before sailing due to poor market conditions and the fact that the underwriters did not like the size of the Chippewa II for ocean work. One underwriter offered hull insurance, but only for New York harbor.

After the survey, the tug was drydocked at Rodermond Industries in New Jersey. The propeller was reconditioned, the rudder gland bushing was reset, a welding machine was installed on board, several doublers were welded to the hull and various cracks

welded in the hull plating. The vessel was refloated on December 18, 1975, after which the owner installed a 900 lb. welding generator on top of the deckhouse, above the pilothouse.

Chippewa II left Raritan Center, Edison, N.J. at 7:30 AM on December 21, 1975. Six were on board, as follows:

| | |
|---|---|
| Otto Evers, captain, | age 38; |
| Edward Malia, mate, | age 51; |
| Steve Soyak, engineer, | age 51; |
| John Rembish, deckhand, | age 19; |
| Michael Parella, deckhand, | age 23; |
| Leon Kubik, deckhand, | age 17. |

After clearing New York harbor, the vessel immediately encountered heavy weather and was forced to pull into Atlantic City due to a blinding snow storm. The compass card was found to be sticking to a northeast heading, and the vessel stayed in port a day for compass repair.

The storm abated and the tug left Atlantic City about 1 PM on December 23, 1975. It stayed within 3 miles of shore, proceeded south across Chesapeake Bay and entered the Intercoastal Waterway at Norfolk, Va. It stopped at Hobuchen, N.C. on Christmas to allow the crew to phone home, and then proceeded to Florida using the Intercoastal Waterway whenever possible. Storms were encountered on this run, and when not in the Waterway the tug experienced heavy rolling in rough seas. It grounded several times in the Waterway but was freed without damage. Radio contact with Brown was almost daily, giving progress reports and updated ETA's.

The tug docked at Ft. Pierce, Fla. on December 29, 1975 and deckhand Parella left the vessel to return home. Efforts were made to repair the radar, and while the defect was diagnosed, repair parts were not available. The tug left Fort Pierce on December 31, 1975, planning to use the cross-Florida canal and make repairs in Tampa.

After grounding twice, Evers decided to abandon the attempt to use the canal and decided to go around Key West and through

the Gulf to New Orleans. The tug arrived at Port Everglades on January 2, 1976. Deckhand Kubik had developed pneumonia and left the vessel at this point. With a full load of fuel and fresh water, Chippewa II left Port Everglades on January 4, 1976 at 1:30 PM, with Captain Evers, Mate Malia, Engineer Soyak and Deckhand Rembish aboard.

At about 10 AM on January 5, 1976, Evers called his mother, who lived near Ft. Lauderdale, through the marine operator. He reported that he was going through the Keys and had another 50 miles to go to reach the Gulf. Arrangements were made to call again on January 7, 1976. Then followed the call to Brown, described above, the ensuing silence, the disappearance and fruitless search.

The foregoing history is summarized from a U.S. Coast Guard investigative report dated April 28, 1976, attached to the affidavit submitted with the motion of Evers Marine Service, Inc., to dismiss the complaint under F.R.Civ.P. 12(b) on the ground that it is barred by the applicable statute of limitations. It is argued that Evers died in January, 1976, and that suit filed here on October 26, 1979, which is about 44 months after the tug was lost with all aboard, is barred by the two year statute applicable to the Death on the High Seas Act (46 U.S.C. § 761, et seq.) and general maritime law, and by the three year statute applicable to the Jones Act (46 U.S.C. § 688). Brown filed a like motion.

Rodermond Industries, Inc. filed answer generally leaving plaintiffs to their proofs and raising (among others) the defense of the statute of limitations, but has filed no motion. Argonaut Insurance Company, as to whom there are no allegations whatever in the complaint, was dismissed as a party by stipulation filed December 21, 1979.

Plaintiffs met the motion with affidavits of counsel and Joan Evers, the substance of which shows that there is no genuine issue in respect to the fact of the death of Otto Evers at or about the time the Chippewa II disappeared in the Gulf of Mexico in early January, 1976.

Rather, the answering affidavits rely on a judgment, dated October 27, 1976, entered by the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C–4801–75, and purporting to be pursuant to N.J.S.A. 2A:83–5, the ordering part of which reads:

"It is on this 27th day of October, 1976, ORDERED that Otto Evers, Jr. is hereby declared dead."

This judgment, it is argued, establishes the date of death in legal contemplation as having occurred October 27, 1976. The complaint here was filed October 26, 1979, within 3 years thereafter, and it is asserted that the October 27, 1976 date is the one to be used for measuring the statute of limitations. If that were so, then suit was begun within the three year period set by the Jones Act, but a year after the two year period set by the Death on the High Seas Act and for general maritime claims.

The answering affidavits also present material for the purpose of arguing explanations for the delay and claiming lack of prejudice to defendants. Aside from the Superior Court action, evidently processed under N.J. Court Rules R. 4:92–1 to 5, mention is made of a claim filed with the U.S. Department of Labor under the Public Worker's and Longshoreman's Act (a claim that was withdrawn because Otto Evers was not a "seaman" within the meaning of the statute). Another claim is said to have been filed under the N.J. Workers Compensation Law, but the outcome is not disclosed. It is also said that suit was filed against Brown for loss of the tugboat itself, in 1977, and that it was settled in 1978, but there is no information about who the plaintiff was, where suit was filed or what judgment was entered. From the brief it appears that these other proceedings are relied on to show an uncertainty of plaintiffs in respect to whether claims existed, against whom, and the like.

A reply affidavit on behalf of defendants shows that plaintiffs' present attorney (who also handled all other matters) was aware in May, 1977, of the issuance of a policy

covering Workers Compensation and Employer's Liability, knowledge contradicting the affidavit of Joan Evers that she first learned of the possible existence of a liability policy in 1978.

Several other items appear from inspection of the reply affidavit. Photocopy of papers attached disclose that the widow was named "Alice", not "Joan". The complaint does not identify any of the individuals named in terms of their relation to decedent.

Also there is a copy of answer of Evers Marine Services, Inc., in a suit by Helen Soyak, administratrix ad pros. for the estate of Stephen Soyak (the engineer) in this court, Docket 78–32. This raises the question of a conflict of interest on the part of the attorney acting for plaintiffs to assert a claim in this case *against* Evers Marine Service, Inc., and for that company to *resist* a claim against it on behalf of survivors of another crewmember lost at the same time. There may also be other suits of which the court has not been made aware.

In any event, the motion cannot be dealt with under F.R.Civ.P. 12(b), the only rule cited, on statute of limitations grounds. This is for the reason that the complaint is a bare skeleton of "notice" pleading, and while it alleges that "Otto Evers was lost at sea" (First Count, par. 2); and that ". . . the vessel, the Chippewa II, was lost at sea" (Third Count, par. 4); and that "negligence of the Defendant, Evers Marine Service, Inc., was the proximate and direct cause of the injury and death of Otto Evers" (Fourth Count, par. 5); and that "At the time of the death of Otto Evers on the Chippewa II, the Chippewa II was located beyond a marine league off Key West, Florida" (Fifth Count, par. 3), the complaint carefully and, in the court's view, deliberately, avoids making any allegation of *when* the Chippewa II was lost and *when* Otto Evers died, beyond saying that: "In October of 1976, Otto Evers was declared dead" (First Count, par. 3), obviously referring to the Superior Court judgment mentioned above. Thus, the complaint "on its face" does not show when the limitation periods began to run.

The motion relies on matters of fact outside the pleadings, and so can only be dealt with as a motion for summary judgment under Rule 56, with opportunity to the parties to present materials pertinent thereto. That has been done. The motion by Evers Marine was grounded on an affidavit accompanied by the Coast Guard report. That report, while hearsay, comes within the exception of Fed.Ev.Rule 803(8) as a report of a public agency setting forth factual findings resulting from an investigation made pursuant to authority granted by law. The authenticity is not challenged (in fact it was relied on to secure the Superior Court order to show cause), nor is it claimed that the sources of information or other circumstances indicate lack of trustworthiness. The tenor of the report displays the results of an exhaustive and careful investigation at what must have been considerable expense.

It seems to have been the rule at common law that at the close of a period of 7 years of continuous absence abroad, during which nothing is heard from the absentee, death is presumed. See, *Scott v. McNeal*, 154 U.S. 34, 14 S.Ct. 1108, 38 L.Ed. 896 (1894); *Osborn v. Allen*, 26 N.J.L. 388 (S.Ct.1857). In most states if not all, statutes to the same effect have been enacted, declaratory of the common law and sometimes said to raise a "presumption of law" of the fact of death. The first such Act in New Jersey seems to have been passed in 1797, *Nixon's Digest*, 194, § 4.

Such laws are commonly referred to as "Enoch Arden" laws, referring to Tennyson's poem of a seaman who spent many years on an uninhabited tropical island after a shipwreck, after which he returned home only to find that his wife, believing him dead, had remarried and so quietly leaves without revealing his existence. See, "Enoch Arden Revisited", Journal of Family Law, Vol. 13, p. 245. The present New Jersey statute was amended in 1977, effective September 1, 1978, to reduce the period of absence from 7 years to 5 years. See N.J.S.A. 3A:40–1 (pocket part). The last sentence reads:

"His death is presumed to have occurred at the end of the period unless there is sufficient evidence for determining that his death occurred earlier."

■ This sentence expresses a principle, also long recognized, that where there is more than a mere unexplained absence, such as exposure to a specific peril, the fact and time of death may be adjudicated (like any other fact) even though there be no *corpus delicti*. See e. g., Rutgers Law Rev. Vol. 3, p. 266 (1949). All such adjudications, just as all presumptions from the passage of time, are always subject to being vacated and set aside if it later appears that the person found to have died in fact survived.

All are familiar with the incident arising out of the mutiny on the Bounty, a well-documented occurrence. Captain Bligh was set adrift with some of the crew in a long-boat off Tahiti on April 28, 1789. Nearly two months later on June 14, 1789 he arrived at Timor, 3,618 miles away. Many will recall the near-miraculous survival of Eddie Rickenbacker, whose plane was forced to "ditch" in the Pacific in 1942, and who was rescued after drifting for 24 days on rubber rafts without provisions or survival kits. See *World Book Encyclopedia* (1976 ed.), p. 311; "Eddie Rickenbacker" by Adamson (MacMillen, 1946); "Rickenbacker" (autobiography) (Prentice-Hall, 1967).

The longest recorded survival in recent decades after shipwreck at sea is said to have been that of one Pooh Lim, who was rescued after 133 days adrift on a rigid merchant ship raft in the South Atlantic. See "Airmen Against the Sea", published by the Research Studies Institute (now the Environmental Information Division) at Maxwell Air Force Base in Alabama. The same publication lists cases of survival in rubber rafts ranging from 5 minutes to 48 days after wreck, and terms the latter period as approaching the limits of human endurance. It also reports that less than 10% of survivors of wrecks endure more than two days. [This information was kindly furnished by Commander James White, U.S. Coast Guard, officer-in-charge of the U.S. Coast Guard Search & Rescue School at Governor's Island, through Lt. Commander Robert Monahan, USNR. It is mentioned here by way of illustration and not as a matter judicially noticed].

■ The detailed facts set out in the U.S. Coast Guard report, none of which is questioned in any way, point inexorably to the death of Otto Evers, probably by the morning hours of January 6, 1976, after he had traversed the 50 miles into the Gulf of Mexico in a small and "tender" tugboat with a 900 lb. welding generator mounted atop. If he did not die then, he had died beyond a reasonable doubt by the end of January 16, 1976, when the sea/air rescue search was called off. The proof is not absolutely certain, and will never be without his identified remains. However, it has sufficiently strong support to warrant the conclusion that there is no genuine issue about this material fact. Even if he survived as long as Pooh Lim (133 days), after January 6, 1976, that would extend only to May 19, 1976. Thus, both applicable statutes had run out before suit was filed here, and nothing has been shown to support a tolling of either statute.

Service on Evers Marine Service, Inc., could have been made at any time on the allegedly sole officer and director at his usual place of abode by leaving a copy with a competent member of his family over the age of 14 years then residing there, N.J. Court Rule R. 4:4–4(c)(1) and (a). In any event service could have been effected on the Secretary of State, N.J.S.A. 2A:15–26.

The judgment of the Superior Court of October 27, 1976 does not stand in the way. That judgment, on its face, did no more than determine that Otto Evers was then dead, without deciding when he died.

Since the argument on the motion, the court has been supplied with a certified transcript of the hearing before Judge Furman in Superior Court (Docket C–4801–75) held October 1, 1976. That transcript is directed to be filed by the clerk as part of the record here. The testimony taken overwhelmingly supports what has been said above, namely, that there is no genuine

issue about the material fact that Otto Evers died in January, 1976 as the result of the loss of Chippewa II, a tugboat designed for canal (or harbor use) but not for ocean-going travel. The details are numerous, including the limited freeboard of about 1 foot, the "tender" balance of the vessel, and the addition of a 900 lb. generator atop the pilot house, all coupled with high winds and high seas.

The court is reminded of the account of the "Vasa", a wooden battleship built when Sweden was a major sea power in Scandanavia. It was designed to bristle with cannon to such an extent that to provide it with enough ballast to make it "stiff", the portholes in the sides would be below the water line. Newly built, it was launched with light ballast, and as a result it was "tender". When the first cross-breeze caught its sails, it keeled over and sank. This event, as the court recalls reading of it, occurred hundreds of years ago, and in recent times the ship was found, raised, and is now housed in a large museum in Stockholm where it can be seen by millions of visitors each year. As an aside, it is said that the ship's architect was brought to the bar to answer for the loss of the ship. His answer was that the ship's plans had been approved by the King, and since the King could do no wrong, the architect could not be held to answer for that which the King had approved. Historians are free to verify this recollection. In any event, the aggregate admission fees paid to see this relic no doubt amount to more than it cost to build the ship and to raise it. Quite aside from these passing observations, the history of the Vasa illustrates to landlubbers what is meant by the term "tender". If the center of gravity of a vessel is too high, relatively light forces will cause it to capsize. Only so long as a vessel is upright and stable will Archimedes' principle apply to keep it afloat.

[Information provided by the Swedish National Tourist Office in New York City indicates that the Vasa was commissioned in 1625 by King Gustav II. The maiden voyage began in 1628, with a crew of 133 sailors, 300 soldiers and an unknown number of relatives. The ship sailed a total of 300 meters before it sank. In 1664 and 1683, salvage efforts raised 54 cannon. The wreck was rediscovered in 1956, and raised from 100 feet of water over the period 1959–1961.]

■ Also, it must not be overlooked that the claim is for the wrongful death of Otto Evers. It is the burden of plaintiffs to prove that fact here, as well as that the death was actionable in the sense that it ensued from some conduct chargeable to a defendant. Plaintiffs have the same facts the defendants do. If Otto Evers died as the consequence of actionable conduct of a defendant, he most certainly was dead by the end of January, 1976 and the claims are barred by limitations. If it be speculated that he did not die then, it follows that he survived the loss of the tug and reached land somewhere. If that speculation be indulged in, then he cannot be regarded as dead until the 5 or 7 year period has elapsed and the suit is premature if sustainable at all.

The case stands or falls on proof of Otto Evers' death in January, 1976 as the consequence of some actionable conduct of a defendant. Plaintiffs cannot have it both ways.

■ Insofar as the Second Count alleges a breach of contract against Brown, and the Third Count against Rodermond Industries, Inc., the complaint fails to state a claim on which relief can be granted since any such contracts were with the corporate entity, Evers Marine Services, Inc., and not with plaintiffs. These contract claims are obviously asserted in an effort to have a 6-year statute apply, with awareness that the death actions were barred by limitations.

Insofar as Brown is concerned, it seems obvious that the contract to tow two barges from New Orleans to Cuba would require that the tug first reach New Orleans where the barges were. It never arrived.

The order granting the motions shall be submitted promptly, but will not be entered until May 12, 1980. On or before that date

plaintiffs have leave to serve and file an amended complaint, if they can, to meet the deficiencies noted. No such amended complaint shall prevent the entry of the order unless it identifies the status and relationship of each individual plaintiff as to decedent, provides allegations of their citizenship, provides allegations of the State of incorporation and principal place of business of each corporate party, clearly states the nature of each claim asserted against each defendant and the jurisdictional basis thereof, and states the alleged date of death of Otto Evers aside from the date of the Superior Court judgment. All other past and pending suits and agency proceedings arising out of the disaster shall also be identified, by way of appendix, naming all parties, docket number, outcome or status.

### APPENDIX

For the sake of clarity, some comments about applicable laws seems appropriate. One is that at the Superior Court hearing on October 1, 1976, reliance on NJSA 2A:83–4, 5 and 6 was misplaced as a ground for receiving the Coast Guard investigation report. Those sections were from NJPL 1945, c. 46 and are limited to findings of presumed death under the "federal missing persons act." That was a 1942 law, enacted early in World War II, and dealt only with persons in the military services or otherwise employed by the executive branch. It did not apply to persons like Otto Evers or members of his crew. See 50 U.S.C. App. § 1001 et seq.

Second, the 1942 law was repealed by Pub.L. 89–554, September 6, 1966, which replaced it with provisions now found at 5 U.S.C. § 5561 et seq. for federal civilian employees in the executive branch, and at 37 U.S.C. § 551 et seq. for military and related personnel. The 1966 laws also do not apply to Otto Evers or his crew.

Third, the Coast Guard statute, 46 U.S.C. § 239, is merely authority to investigate marine casualties to ascertain whether incompetence, etc., contributed to the cause of the casualty. It does not extend to findings in regard to the fact of death or its date.

Fourth, under New Jersey evidence law, the report was probably inadmissible because N.J.Ev. Rule 63(15) does *not* embrace "findings" of public officials other than "statistical findings". Compare Fed.Ev. Rule 803(8)(C) which does embrace factual findings by public officials and which governs in this court.

Fifth, the statutory action authorized by NJSA 3A:40–6 is conducted under N.J. Court Rule R. 4:92, and its object is to provide the basis for issuance of letters of administration (intestate decedents) or for probate of the will (testate decedents) and the like. As of October 1, 1976, the statutory presumption did not speak of determining death before 7 years' absence NJSA 3A:40–1, although the decisions made clear that the court had this authority as a matter of common or equity or probate law, without any statute. See, *In re Bencel's Estate*, 78 N.J.Super. 545, 189 A.2d 733 (1963). That section was amended in 1977, effective September 1, 1978 (a) to reduce the absentee period to five years, and (b) to make explicit that a finding of death before that time can be made where there is sufficient evidence. While not so worded at the time of the 1976 hearing, it is clear that a New Jersey court would have applied the "special peril" doctrine, without regard to the timing of a proceeding for probate purposes. See, e. g., *Scharwenka v. Cryogenics Management, Inc.*, 163 N.J.Super. 16, 394 A.2d 137 (App.1978).